**In re AIRWEST INTERNATIONAL, dba Air Hawaii, Debtor(s).**

**Bankruptcy No. 86–00145.**

United States Bankruptcy Court, D. Hawaii.

March 10, 1987.

Cuyler Shaw, Honolulu, Hawaii, for First Interstate Bank.

Christian Porter and Susan Ichinose, Honolulu, Hawaii, for Trustee.

JON J. CHINEN, Bankruptcy Judge.

First Interstate Bank of Hawaii ("First Interstate") filed a Motion to Lift Automatic Stay on October 15, 1986, and the final hearing was held on December 10, 1986 and February 11, 1987. Present at the hearing were Cuyler Shaw, Esq., appearing for First Interstate, Susan Ichinose, Esq. and Christian Porter, Esq., appearing for the Trustee, Richard Kennedy. The Court, having reviewed and considered the memoranda and affidavits filed in support of and in opposition to the motion, and having heard arguments of counsel at said hearing, hereby makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. On or about December 9, 1985, Airwest International, ("Air Hawaii"), filed a written application requesting that First Interstate issue a standby letter of credit on its behalf in favor of the City and County of San Francisco and its Airport Commission ("S.F. Airport Commission") in the amount of $23,000.00 to serve as a guaranty of Air Hawaii's payment and performance under certain operating agreements between Air Hawaii and the Airport Commission. The application bore a hand-written notation "TCD $20,872.17 pledged plus check $2,127.83 to be placed on TD".

2. On or about December 9, 1985, First Interstate issued a standby letter of credit in favor of the S.F. Airport Commission in the amount of $23,000.00. The expiration date on the letter of credit was December 10, 1986.

3. On or about December 9, 1985, Air Hawaii pledged two certificates of deposit to First Interstate to secure Air Hawaii's obligations to reimburse First Interstate for any amounts disbursed by First Interstate under the letter of credit. The pledged certificates included certificate of deposit No. 134632, dated November 22, 1985, for $20,872.17 and certificate of deposit No. 136305 dated December 9, 1985, for $2,127.83.

4. The terms and conditions upon which First Interstate held the certificates of deposits as collateral for the letter of credit in favor of the S.F. Airport Commission were set forth in a Security Agreement dated December 9, 1985 signed by Air Hawaii.

5. Although the Security Agreement specified that each certificate of deposit would secure not only Air Hawaii's obligations to reimburse First Interstate for any amounts drawn against the Airport Commission letter of credit, but that they would also serve as "collateral security for the payment of any and all overdrafts, liabilities, claims, obligations and other indebtedness" of Air Hawaii, it was intended that the collateral secure only the standby letter of credit.

6. The two certificates of deposit held by First Interstate as security for its letter of credit in favor of the S.F. Airport Commission matured on February 24, 1986. On that date, the two certificates were "rolled over" into a single certificate (No. 140833) for $23,000.00 bearing a maturity date of

December 10, 1986, the date of expiration on the letter of credit.

7. At all times immediately prior to, during and immediately subsequent to the "rollover" of the certificates of deposit, First Interstate remained in possession of the certificates, and no certificate or cash or monies were at any time returned to, released or otherwise placed in the control of Air Hawaii.

8. On or about November 21, 1985, Air Hawaii filed a written application requesting that First Interstate issue a standby letter of credit on its behalf in favor of the U.S. Customs Service in the amount of $10,000.00.

9. On or about November 21, 1985, First Interstate issued a standby letter of credit in favor of the U.S. Customs Service in the amount of $10,000.00. The expiration date on the letter of credit was November 26, 1986.

10. On or about November 21, 1985, Air Hawaii pledged a certificate of deposit to First Interstate to secure Air Hawaii's obligations to reimburse First Interstate for any amounts disbursed by First Interstate under the letter of credit. The pledged certificate was certificate of deposit No. 134617, dated November 21, 1985, for $10,000.00. The certificate matured on November 26, 1986.

11. The terms and conditions upon which First Interstate held the certificate of deposit as collateral for the letter of credit in favor of the U.S. Customs Service were set forth in a Security Agreement dated November 21, 1985 which was signed by Air Hawaii.

12. Although the Security Agreement specified that the certificate of deposit collateral would secure not only Air Hawaii's obligations to reimburse First Interstate for any amounts drawn against the letter of credit, but that it would also serve as "collateral security for the payment of any and all overdrafts, liabilities, claims, obligations and other indebtedness" of Air Hawaii, it was intended that the collateral secure only the standby letter of credit.

13. On or about September 24, 1985, First Interstate and Air Hawaii signed a First Interstate Bank of Hawaii Charge Card Program Member Agreement under which Air Hawaii agreed to participate in the First Interstate Charge Card Program and under which Air Hawaii could sell passenger tickets, including coupon books, to customers using VISA or MasterCard charge cards.

14. A substantial number of the coupon books sold by Air Hawaii in Hawaii and on the mainland were processed by First Interstate pursuant to the Charge Card Program Member Agreement described above.

15. Air Hawaii ceased flight operations in early March of 1986. It has not resumed flight operations. And, on March 14, 1986, Air Hawaii filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the United States District Court for the District of Hawaii.

16. Cessation of flight operations by Air Hawaii made the ticket coupons irredeemable for air transportation and rendered the coupon books worthless.

17. Pursuant to the requirements of the agreements entered into between First Interstate, on the one hand, and VISA and MasterCard, on the other, First Interstate was required to honor "charge-backs" from certain of the persons who had purchased coupon books using VISA or MasterCard charge cards but who were unable to use the tickets or coupons or to obtain refunds from Air Hawaii because of Air Hawaii's cessation of flight operations and bankruptcy, and who took all steps and made all certifications required to qualify for charge-backs under the VISA and MasterCard charge card rules and regulations.

18. First Interstate claims that the amount expended to date in connection with charge-backs by coupon book purchasers exceeds $4.5 million.

19. Under the terms of the Charge Card Program Member Agreement, Air Hawaii is required to indemnify and reimburse under paragraph 8 of the Member Agreement titled "Indemnification" First Interstate

with respect to all charge-backs. Air Hawaii is therefore currently indebted to First Interstate in an amount exceeding $4.5 million, representing the aggregate expense incurred by First Interstate in connection with the charge-backs.

20. On or about October 9, 1986, and pursuant to appropriate demand made by the S.F. Airport Commission on its letter of credit, First Interstate was required to and did pay the sum of $20,410.40.

21. On November 21, 1986, and pursuant to appropriate demand made by the U.S. Customs Service on its letter of credit, First Interstate was required to and did pay the sum of $40.38.

22. To the extent that these Findings of Fact constitute Conclusions of Law, they shall be so considered.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter.

2. First Interstate has a valid, perfected and enforceable security interest in the two certificates of deposit initially pledged by Air Hawaii to secure the letter of credit in favor of the S.F. Airport Commission, being Certificates of Deposit Nos. 134632 and 136305.

3. The Trustee contends that First Interstate's security interest in the certificates of deposit is not enforceable because the certificates were not adequately described in the Security Agreement. However, the Court need not decide whether the description was adequate since First Interstate was in possession of the certificates of deposit. The requirement of the Uniform Commercial Code ("U.C.C.") that a debtor sign a security agreement with an adequate description of the collateral only applies in cases where the collateral is not in the possession of the secured party. *See* U.S.C. § 9–203(1)(a). Pursuant to U.C.C. Section 9–305, possession of the certificates of deposit perfected the security interest.

4. The Trustee also contends that the rollover of the two certificates of deposit into a single certificate constituted a preferential transfer voidable by the Trustee under § 547 of the Code.

5. U.C.C. § 9–306 states in part:

(1) "Proceeds" includes whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Money, checks, deposit accounts, and the like are "cash proceeds". All other proceeds are "noncash proceeds".

(2) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

(3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected ten days after receipt of the proceeds by the debtor unless

. . . .

(c) the security interest in the proceeds is perfected before the expiration of the ten day period.

Except as provided in this section, a security interest in proceeds can be perfected only by the methods or under the circumstances permitted in this Article for original collateral of the same type.

(4) In the event of insolvency proceedings instituted by or against a debtor, a secured party with a perfected security interest in proceeds has a perfected security interest only in the following proceeds:

(a) in identifiable non-cash proceeds and in separate deposit accounts containing only proceeds;

6. U.C.C. Section 9–303 states:

(1) A security interest is perfected when it has attached and when all of the applicable steps required for perfection have been taken. Such steps are specified in Sections 9–302, 9–304, 9–305 and 9–306. If such steps are taken before the security interest attaches, it is perfected at the time when it attaches.

(2) If a security interest is originally-perfected in any way permitted under this Article and is subsequently perfected in some other way under this Article, without an intermediate period when it was unperfected, the security interest shall be deemed to be perfected continuously for the purposes of this Article.

7. Comments 2 to the section states in part:

If the successive stages of the bank's security interest succeed each other without an intervening gap, the security interest is "continuously perfected" and the date of perfection is when the interest first became perfected.... If, however, there is a gap between stages—for example, if the bank does not file until after the expiration of the 21 day period specified in Section 9–304(5), the collateral still being in the debtor's possession —then, the chain being broken, the perfection is no longer continuous. The date of perfection would now be the date of filing (after expiration of the 21 day period); the bank's interest might now become subject to attack under Section 60 of the Federal Bankruptcy Act and would be subject to any interests arising during the gap period which under Section 9–301 take priority over an unperfected security interest.

8. There is no doubt that Certificate No. 140833 is "proceeds" of the original collateral (Certificates Nos. 134632 and 136305), and that at all times the certificates remained in First Interstate's sole and exclusive possession and control.

9. As stated in White and Summers, *Uniform Commercial Code* (2d ed. 1980),

The article Nine secured creditor does prevail over the trustee as to (1) identifiable non-cash proceeds and separate deposit accounts which contain only proceeds, (2) identifiable cash proceeds in the form of money not commingled with other money or deposited in a bank account prior to bankruptcy and (3) identifiable cash proceeds in the form of checks and the like which were not deposited in a bank account prior to the bankruptcy proceedings. However, if the debtor has commingled the proceeds of the collateral with other cash or in a deposit account, the creditor must turn to [U.C.C.] 9–306(4)(d).

Thus, First Interstate also has a valid, perfected and enforceable security interest in Certificate of Deposit No. 140833 for $23,000.00 issued by First Interstate on February 24, 1986 to replace the two predecessor certificates which matured on that date.

10. First Interstate has a valid, perfected and enforceable security in Certificate of Deposit No. 134617 pledged by Air Hawaii to secure the letter of credit issued in favor of the U.S. Customs Service.

11. First Interstate claims that their security interest in the certificates of deposit secures not only Air Hawaii's obligation to reimburse First Interstate for amounts drawn against the letter of credit by the S.F. Airport Commission, but also "any and all overdrafts, liabilities, claims, obligations and other indebtedness" of Air Hawaii as specified in the Security Agreement.

12. U.C.C. Section 9–105(1) states: " 'Security agreement' means an agreement which creates or provides for a security interest".

13. U.C.C. Section 1–201(3) states:

"Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1–205 and 2–208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1–103). (Compare "Contract".)

14. Although the U.C.C. does not specifically state that intention to create a security agreement is an element necessary to creating a valid security agreement, it is clear that intention to do so is required. See U.C.C. §§ 9–201 and 9–203.

15. In *In re Owensboro Canning Co., Inc.*, 40 U.C.C.Rep. 1446 (Bkrtcy.W.D.Ky. 1985), the Court quoted with approval the analysis found in White & Summers, Handbook of the Law Under the Uniform Commercial Code, Section 23–3 (1980):

> The conjunction of 9–203 and 9–105 calls for two independent inquiries. The *court* must first resolve, *as a question of law,* whether the language embodied in the writing objectively indicates that the parties may have intended to create or provide for a security interest. If the language crosses this objective threshold, that is, if the *writing* evidences a possible secured transaction and thus satisfies the statute of frauds requirement, then the *factfinder* must inquire whether the parties actually intended to create a security interest. Parol evidence is admissible to inform the latter, but not the former inquiry. (footnote omitted).

16. *Semco Div., Delwood Furniture Co. v. Williams,* 405 F.Supp. 622 (N.D.Ala. 1975), involved a debtor operating both a manufacturing-wholesale furniture business and a retail furniture business under different names and at different locations. A security agreement covered "all machinery, equipment and inventory maintained in the conduct of the debtor's business...."

17. A question arose as to whether the inventory of the retail business was included under this security agreement. The bankruptcy court held that, based on debtor's testimony, the security agreement was intended to be limited only to the inventory at the wholesale site. On appeal, the district court declined to reverse, holding the finding supported by sufficient evidence noting:

> It is fundamental that the ... Uniform Commercial Code deals with contractual or consensual liens, which can only be

created by agreement of the parties. §§ 9–201 and 9–203.... The fundamental requirement of meeting of the minds is inherent in such agreements, as it is in all contracts. Without a contract. there can be no security interest.

*See also In re Trucker's International Inc.,* 17 U.C.C.Rep. 1337 (Bkrtcy.W.D. Wash.1975); *Komas v. SBA,* 71 Cal.App.3d 809, 139 Cal.Rptr. 669 (1977); *Steego Auto Parts Corp v. Markey,* 2 Ohio App.3d 200, 441 N.E.2d. 279 (1981); *In re H.L. Clement Co.,* 12 B.R. 165 (Bkrtcy.W.D.Pa.1981).

18. In this case, the intent of the debtor when it pledged the certificates of deposits was to secure only debtor's obligation to reimburse First Interstate for any amounts disbursed by First Interstate under the letters of credit to the Airport Commission and to the U.S. Custom's Service. The fact that the pre-printed agreement used by the bank indicates that it would cover all other indebtedness of debtor is not controlling, since Air Hawaii never intended that the certificates be used as collateral for debts other than the amounts disbursed to the S.F. Airport Commission or the U.S. Custom's Service under the respective letters of credit. Thus, First Interstate has a valid security interest in the certificates only as to the amounts disbursed to the S.F. Airport Commission and the U.S. Custom Service.

19. First Interstate is not entitled to offset against the collateral any amount in excess of the amounts actually disbursed to the S.F. Airport Commission and the U.S. Custom Service.

20. Furthermore, First Interstate cannot exercise a right of set-off. Although, banks have a right of set-off against funds held by it in a general deposit account, a bank cannot exercise its right to set-off when the deposit is for a special purpose (i.e., pledged as security for a specific debt).

21: The nature of the deposit is determined by the mutual intent and the understanding of the parties. In addition, the absence of the depositor's right to with-

draw the funds will distinguish a special purpose deposit from a general deposit. Air Hawaii's certificates of deposit were held by First Interstate in a special collateral account. Therefore, the certificates of deposit were to only serve as security for specific debts. They were not in general deposit, and any surplus or any interest which is not used in the application of the certificate of deposit to a specific debt is property of the Estate and not subject to First Interstate's right of set-off. *See e.g. Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573 (1st Cir.1980).

21. To the extent that these Conclusions of Law should be properly deemed Findings of Fact, they shall be so considered.

### ORDER

Based on the above Findings of Fact and Conclusions of Law,

IT IS HEREBY ORDERED that the automatic stay herein be and is hereby lifted to permit First Interstate as the secured party under the Security Agreements to apply the collateral, being certificates of deposit Nos. 140833 and 134617, including all principal and interest thereunder, against Air Hawaii's indebtedness to First Interstate for:

a. the sum of $20,410.40 paid under the S.F. Airport Commission letter of credit;

b. the sum of $40.38 paid by First Interstate under the U.S. Customs Service letter of credit;

IT IS FURTHER ORDERED that the balance of the collateral in excess of the above amounts shall be turned over to the Trustee.

A Judgment will be signed upon presentment.