[No. H008033. Sixth Dist. Nov. 22, 1991.]

NEW WEST FRUIT CORPORATION, Plaintiff and Respondent, v.
COASTAL BERRY CORPORATION, Defendant and Appellant.

COUNSEL

Martin Drobac for Defendant and Appellant.

Miller, Morton, Caillat & Nevis and Joseph A. Scanlan, Jr., for Plaintiff and Respondent.

## OPINION

**CAPACCIOLI, Acting P. J.**—In this appeal we consider whether a contract that purports to grant a security interest to a creditor is enforceable if it fails to fully delineate the nature of the debtor's obligation. As we will explain below, we conclude that this fact alone does not preclude enforcement of a security agreement if the language of the agreement and circumstances of the transaction reveal an intent by the parties to grant a security interest to the creditor.

### BACKGROUND

Both parties to this action, New West Fruit Corporation (New West) and Coastal Berry Corporation (Coastal Berry), are brokers of fresh strawberries.

In the second half of 1984 New West's predecessor, Monc's Consolidated Produce, Inc. (Monc's), made loans of money and strawberry plants to a group of strawberry growers known collectively as Cooperativa La Paz. In September 1984 Monc's and Cooperativa La Paz entered into a contract entitled "Sales and Marketing Agreement," which granted Monc's the exclusive right to market the strawberries grown by the collective during the 1984-1985 season. The agreement did not specifically refer to advances of money or plants either already made or contemplated.

Paragraph 18 of the agreement provided the following: "In order to secure all of Grower's obligations under this agreement, Grower hereby gives to Shipper [Monc's] a security interest in all crops growing or to be grown on the above-described property in the crop year 1984-1985 and the proceeds thereof, and agrees to sign a financial statement and any other documents needed to perfect Shipper's security interest."

Matias Rosales, a representative of Cooperativa La Paz, signed both the Sales and Marketing Agreement and a commercial financing statement, which Monc's filed in order to perfect its security interest. (See Cal. U. Com. Code, §§ 9401, 9402.)

Monc's closed down in January 1985 and its assets were orally assigned to plaintiff New West Fruit Corporation.[1] In April 1985 New West learned that Cooperativa La Paz had agreed to market its 1985 strawberry crop through its competitor, defendant Coastal Berry Corporation. New West representatives immediately arranged a meeting with the president and local manager of Coastal Berry. At the meeting, New West advised the Coastal Berry officers of its contract with the growers. According to the trial testimony of William Moncovich, president of New West, "we told them that [the growers] had a contract, that we had money lent out to these growers, that we basically wanted our money back if, in fact, they were planning on shipping through them. There was no way we could change our mind, that we did have a financing statement, we did have a contract with them that money was owed." Moncovich showed Coastal Berry representatives the Sales and Marketing Agreement and suggested that Coastal Berry either pay New West the amounts owed by the growers or allow New West to market the berries so it could recoup the money. New West received no response to its request.

After Coastal Berry began marketing the growers' berries, New West sent letters demanding payment of proceeds from the sale of the berries. In August 1985 New West filed suit against Coastal Berry, Cooperativa La Paz

---

[1]Written assignment took place in March 1987, after litigation had been initiated. Assignment was made effective as of February 1, 1985.

and its individual growers, and a berry freezing company that was accepting some of the growers' lower-quality berries. New West settled with all defendants except Coastal Berry before trial, leaving an outstanding claim of over $14,000.

At trial New West invoked the language of paragraph 18 of the *Sales and Marketing Agreement*, asserting that this provision had conveyed a security interest to Monc's in exchange for the advances Monc's had made to the growers. New West argued that Coastal Berry was not only on constructive notice of the security interest through the recorded financing statement, but also on actual notice through the direct information given to it at the April meeting and subsequent demand letters.

Coastal Berry responded, citing *Needle v. Lasco Industries, Inc.* (1970) 10 Cal.App.3d 1105 [89 Cal.Rptr. 593], that the contract between Monc's and the growers was not an effective security agreement because it failed to identify precisely the debt to be secured. Coastal Berry also questioned Matias Rosales's capacity to bind the "mystic" Cooperativa La Paz, whose identity as a legal entity was undemonstrated.

The trial court found that the Sales and Marketing Agreement was a "poorly drafted, but . . . adequate" security agreement which, when considered as a "routine business transaction" between the parties, was sufficient to memorialize the debt owed by Cooperativa La Paz to New West. Coastal Berry, the court reasoned, was put on actual notice of the debt when presented with this agreement, and consequently should have retained sufficient funds from its sales of the strawberries to cover New West's claim. The trial court accordingly granted judgment for New West in the amount of $14,269.86 plus interest.

## DISCUSSION

On appeal, Coastal Berry renews its contention that the Sales and Marketing Agreement was not an effective security agreement because it "did not create nor [*sic*] recite an obligation on the part of the growers to repay [a] debt to Monc's, nor did it create an obligation by Monc's to loan funds."According to Coastal Berry, such a term reflecting the nature of the debt is required under Commercial Code section 9203 and under *Needle v. Lasco Industries, Inc., supra*, 10 Cal.App.3d 1105.

The rules governing secured transactions are embodied in division 9 of the California Uniform Commercial Code (Cal. U. Com. Code, § 9101 et seq.[2]). These sections apply to *any* transaction, regardless of its form, which is *intended* to create a security interest in personal property or fixtures, including goods.[3] (§ 9102, subd. (1)(a).) "Security interest" is defined by section 1201, subdivision (37)(a), as "an interest in personal property or fixtures which secures payment or performance of an obligation."

A security interest becomes enforceable against the debtor when three conditions are met: (1) the debtor has signed a security agreement containing a description of the collateral and, when the security interest is in crops, a description of the land concerned; (2) value has been given; and (3) the debtor has rights in the collateral. (§ 9203.) The filing of a financing statement perfects the security interest, thereby giving notice to and assuring priority over interested third parties. (§ 9302.)

There is no dispute that the second and third conditions of section 9203 were met in this case. Our focus is instead on the first requirement, in determining whether the document Matias Rosales signed on behalf of Cooperativa La Paz was a "security agreement." Coastal Berry argues that the Sales and Marketing Agreement was not a valid security agreement because it failed to describe the advances to the growers and their obligation to repay them.

A security agreement is simply defined by section 9105, subdivision (1)(*l*), as "an agreement which creates or provides for a security interest." With specified exceptions, a security agreement is "effective *according to its terms* between the parties, against purchasers of the collateral and against creditors." (§ 9201, italics added.) Section 9102 does not limit the scope of secured obligations to pledges or loans of money, but can apply to *any* security interest created by contract. (§ 9102, subd. (2).)

■ Division 9 does not specifically require delineation of the debt owed to the secured party. Instead, the creation of a valid security interest turns on "whether the parties intended the transaction to have effect as security." (Code Comrs. Comm. foll. 23C West's Ann. Cal. U. Com. Code, § 9102, (1990 ed.) p. 293; U.C.C Comm., § 9-102 [¶ 1.) "No special form is necessary to create a security interest. [Citation] It is sufficient if the parties use language that indicates the parties intended to create a security interest . . . and if the security agreement reasonably identifies the property subject

---

[2]All further statutory references are to the California Uniform Commercial Code unless otherwise indicated.

[3]The term "goods" includes growing crops. (§ 9105.)

to the agreement." (*Personal Jet, Inc.* v. *Callihan* (5th Cir. 1980) 624 F.2d 562, 568; *Komas* v. *Future Systems, Inc.* (1977) 71 Cal.App.3d 809, 816 [139 Cal.Rptr. 669]; see also *In re Amex-Protein Development Corporation* (9th Cir. 1974) 504 F.2d 1056, 1059 [no magic words necessary to create security interest].)

■ "Briefly stated, under section 9-201 alone the parties to a commercial security agreement can effectively secure the payment or performance of any past, present, or future legally enforceable obligation of the debtor to the creditor, and can do so with any of the debtor's existing or subsequently acquired personal property. Section 9-201 thus generally validates future advance and all obligations clauses against both debtors and third parties. Those agreements not meeting the formalities required by section 9-203 and those agreements running afoul of the common-law policing doctrines are the only commercially important exceptions." (Campbell, *Contracts Jurisprudence and Article Nine of the Uniform Commercial Code: The Allowable Scope of Future Advance and All Obligations Clauses in Commercial Security Agreements* (1986) 37 Hastings L. J. 1007, 1024 (hereafter cited as Campbell).)

Section 9204, subdivision (3) further validates grants of security interests where, as in this case, the collateral secures "all obligations" or future advances: "Obligations covered by a security agreement may include future advances or other value whether or not the advances or value are [*sic*] given pursuant to commitment."[4]

■ These provisions of the Califoria Uniform Commercial Code make it clear that to be enforceable, a security agreement need not specify the value of the loan or recite the debtor's obligation to repay it. As long as the formalities of section 9203 have been met, any payment or performance obligation covered by the security agreement may be secured. (Campbell, *supra*, at p. 1024.) The pivotal question, therefore, is whether the challenged obligation is covered by the security agreement. This question can be answered only by ascertaining the intent of the parties to the transaction.

*Needle* v. *Lasco Industries, supra*, 10 Cal.App.3d 1105, on which Coastal Berry heavily relies, does not direct otherwise. In that case there was no security agreement, but only a financing statement. The court held that in the absence of a security agreement, the financing statement was ineffective. The financing statement could not in itself serve as a security agreement because it lacked evidence of an agreement to grant the creditor a security interest.

---

[4] The term "pursuant to commitment" refers to advances which the secured party has bound himself or herself to make. (§ 9105.)

Coastal Berry, however, points to the *Needle* court's general statement in dicta that "[a]t a minimum the 'terms' [of a security agreement] must recite the obligation secured." (10 Cal.App.3d at p. 1108.) This statement, however, should not be given an overly restrictive interpretation, particularly when to do so would invalidate a security interest both parties intended to convey to the creditor. As noted above, the critical factor in defining the parameters of a security agreement is the intent of the parties. Thus, although we agree that the Sales and Marketing Agreement lacked precision in identifying the obligations secured, this deficiency was not fatal if the loans at issue here were within the intended scope of the ongoing business relationship between Monc's and Cooperativa La Paz. (See Campbell, *supra*, at pp. 1026-1032.) We next turn to that question.

■  As in any contract interpretation task, to determine the intended scope of secured obligations we must look to the reasonable expectations of the parties. (Campbell, *supra*, at pp. 1026-1032.) To this end we utilize general principles governing commercial agreements as well as specific rules pertaining to secured transactions.

An "agreement" under the California Uniform Commercial Code "means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance. . . ." (§ 1201, subd. (3).) Course of dealing, trade usage, and course of performance are all factors which are relevant to "give particular meaning to and supplement or qualify terms of an agreement." (§ 1205, subd. (3); § 2202; § 2208; see *Heggblade-Marguleas-Tenneco, Inc.* v. *Sunshine Biscuit, Inc.* (1976) 59 Cal.App.3d 948, 955 [131 Cal.Rptr. 183].)[5]

■  All of these factors are applicable in the present case and give a consistent meaning to the provision in paragraph 18 securing "all obligations" of the growers. William Moncovich testified, and the court so found, that in September 1984 when the Sales and Marketing Agreement was executed, it was the general custom and practice in the California strawberry production industry to advance money to growers to help grow and harvest their crops, and to secure such advances by requiring the growers to sign

---

[5]As defined in the California Uniform Commercial Code, a course of dealing is a "sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." (§ 1205, subd. (1)) Trade usage includes "any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts. . . ." (§ 1205, subd. (2).)

both a sales and marketing agreement, which granted an interest in the crops, and a financing statement. Monc's had made similar advances to the members of Cooperativa La Paz in the past, and the agreement they executed was a standard one Monc's used with growers to whom such loans were made. The court in fact found that the agreement was similar to one used by Coastal Berry.

The language of the agreement itself anticipates such loans, referring to the right to refuse any strawberries grown in violation of federal regulations without discharging "any indebtedness . . . owed by Grower to Shipper [Monc's] for materials, services, or money furnished in connection with the growing, production, or sale of the Strawberries." The agreement also mentions Monc's willingness to subordinate to commercial lending institutions its "loans made to grower to be used for the growing of the Strawberries. . . ."

Finally, the record indicates that after the agreement was executed, Monc's continued making loans to the growers and deducting the amounts they owed from the proceeds of strawberry sales; the growers' acquiescence in this course of performance indicates this exchange was mutually understood to be within the scope of the ongoing relationship between the growers and Monc's. In summary, although the Sales and Marketing Agreement was, in the trial court's words, "not terribly artfully drafted," we agree with the court below that it was adequate to convey the parties' intent to grant Monc's a security interest in the strawberries and the proceeds thereof. Furthermore, when considered together with the circumstances of its execution—including the financing statement, the past relationship between Monc's and the growers, and general practice in the strawberry production industry—this document should be read to encompass the growers' obligation to repay loans made by Monc's to assist them in financing production of their strawberry crop.

In view of this result, there is no justification for Coastal Berry's disregard of the growers' outstanding debt to New West. Coastal Berry does not contest the trial court's express finding that it had both constructive and actual notice of growers' obligation to New West; its only challenge is to the enforceability of the Sales and Marketing Agreement. Since we have concluded that this document effectively conveyed to New West's predecessor a security interest superior to the interest of Coastal Berry, there is no remaining foundation for Coastal Berry's continued denial of liability.

## DISPOSITION

The judgment is affirmed.

Premo, J., and Cottle, J., concurred.