**In re CFLC, INC., a Delaware Corporation, f/k/a Everex Systems, Inc., Debtor.**

**EXPEDITORS INTERNATIONAL OF WASHINGTON, INC., Appellant,**

**v.**

**OFFICIAL CREDITORS COMMITTEE OF CFLC, INC., Appellee.**

BAP No. NC–96–1232–OVMe.
Bankruptcy No. 93–40001.
Adv. No. 94–4169 AN.

United States Bankruptcy Appellate Panel of the Ninth Circuit.

Argued and Submitted Jan. 23, 1997.

Decided June 3, 1997.

Robert E. White, Law Offices of Robert E. White, San Francisco, CA, for Expeditors Intern. of Washington, Inc.

Terrence V. Ponsford, Bronson, Bronson & McKinnon, San Francisco, CA, for Official Creditors Committee of CFLC, Inc.

Before: OLLASON, VOLINN and MEYERS, Bankruptcy Judges.

## *OPINION*

OLLASON, Bankruptcy Judge:

Creditor Expeditors International of Washington, Inc. ("Expeditors") appeals the bankruptcy court's order granting partial summary judgment in favor of the Official Creditors Committee of CFLC, Inc. ("Committee") and dismissing its adversary complaint to determine the validity, priority and

extent of an alleged possessory lien, and for attorney's fees.[1]

**We Affirm.**

## STATEMENT OF FACTS

Debtor CFLC, Inc., formerly known as Everex Systems, Inc. ("Everex"), filed a voluntary Chapter 11[2] petition on January 4, 1993. The 90–day period before the petition date began on October 6, 1992. The following facts were stipulated.

Since August of 1991, Expeditors provided transportation related services for Everex including freight forwarding, ocean shipping and customs brokerage. It is called an indirect air common carrier because it typically consolidates shipments and utilizes commercial air carriers to perform the physical transportation. For 17 months prior to Everex's bankruptcy petition date, Expeditors handled Everex's import and export shipments. Expeditors negotiated with Everex for all of the forwarder rates and services performed by its subsidiaries and agents, and was in continuous possession, directly or through its agents, of Everex's goods.

Expeditors billed Everex on its regular invoices, issued contemporaneously with its receipt of the shipments. From August, 1991 until January, 1993, Expeditors sent Everex approximately 330 invoices with the identical terms. The reverse side of the invoice contained a page of fine print entitled "Terms and Conditions of Service." The only reference to those terms on the bottom of the invoice fact was a reference to the conditional terms for credit:

1. The bankruptcy court decided cross-motions for partial summary judgment, in favor of the Committee, on August 3, 1995. That order was interlocutory because there were pending counterclaims raised by the Committee. To comply with certification requirements for appeal, on February 23, 1996, the court entered an order entitled "Judgment on Cross Motions for Summary Judgment" stating that there was no reason to delay a separate judgment on the complaint. *See* Fed.R.Bankr.P. 7054/ Fed.R.Civ.P. 54(b). Expeditors appealed the properly certified partial summary judgment.

On March 14, 1996, the bankruptcy court approved a stipulation between the Committee and Expeditors to dismiss the remaining counterclaims. Thereby, the February 23, 1996, summary judgment order effectively became a final judgment on the merits of the complaint. *In re NSB Film Corp.*, 167 B.R. 176, 180 (9th Cir. BAP 1994) (final order "resolves and seriously affects substantive rights" and "finally determines the discrete issue to which it is addressed") (quoting *In re Frontier Properties, Inc.*, 979 F.2d 1358, 1363 (9th Cir.1992)).

2. Unless otherwise indicated, references to Chapter, Section or Code are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330; references to "Fed. R.Bankr.P." are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9036, which make applicable certain Federal Rules of Civil Procedure ("Fed.R.Civ.P.").

TERMS: NET CASH

THE TERMS AND CONDITIONS UNDER WHICH CREDIT IS GRANTED ARE STATED IN PART IN PARAGRAPHS 15 AND 16 ON THE REVERSE. IF YOU ARE UNWILLING TO ACCEPT THESE CONDITIONS, YOU MUST PAY CASH UPON RECEIPT OF GOODS OR COMPLETION OF SERVICE.

Section 15 of the terms and conditions stated:

15. General Lien on Any Property. The Company shall have a general lien on any and all property (and documents relating thereto) of the Customer, in its possession, custody and control or en route, for all claims for charges, expenses or advances incurred by the Company in connection with any shipments of the Customer and if such claim remains unsatisfied for thirty (30) days after demand for its payment is made, the Company may sell at public auction or private sale, upon ten (10) days written notice, registered mail (R.R.R.) to the Customer, the goods, wares and/or merchandise, or so much thereof as may be necessary to satisfy such lien, and apply the net proceeds of such sale to the payment of the amount due to the Company. Any surplus from such sale shall be transmitted to the Customer, and the Customer shall be liable for any deficiency in the sale.

Section 16 stated, in pertinent part:

In any referral for collection or action against the Customer from monies due to the Company, upon recovery by the Company, the Customer shall pay the expenses of collection and/or litigation, including a reasonable attorney fee.

Everex never signed the invoices or any agreement with Expeditors regarding the terms contained in the invoices. The parties never discussed nor expressly bargained over Sections 15 and 16 of the invoice or any other provision on the reverse of the invoice. Everex did not object to the invoices prior to its bankruptcy. At no time prior to October 6, 1992, did Expeditors attempt to enforce Section 15 of the invoice by asserting a security interest or lien against the shipments. On or about October 29, 1992, Expeditors notified an Everex employee that it would be asserting its lien on the Everex goods in its possession until payments were made on outstanding invoices.

During the period before the petition date, the parties continued normal business operations. At the time of Everex's bankruptcy filing, Expeditors was in possession of property of Everex valued at $81,402. As of 90 days before the petition date, Expeditors was in possession of property of Everex valued at over $62,000.[3] Also as of the petition date, Everex owed Expeditors $42,919.33, exclusive of postpetition interest, attorneys' fees and costs for 68 past-due invoices dated January 27, 1992, through October 16, 1992.

On March 15, 1994, Expeditors filed a complaint to determine the validity, priority and extent of the lien under dispute; it filed its first amended complaint on March 24, 1994. Expeditors also sought its attorney's fees under § 506(b) of the Code.[4] Everex answered the complaint on May 16, 1994, and asserted counterclaims, *inter alia*, to set aside a purported preference and to avoid Expeditor's lien as unperfected.

On May 24, 1995, Expeditors and the Official Creditors Committee of CFLC, Inc. ("Committee") as a party defendant filed cross-motions for summary judgment premised on agreed facts. At a July 5, 1995, hearing, the bankruptcy judge found that the evidence did not amount to a course of deal-

---

3. Eventually, Expeditors released Everex's property pursuant to the terms of a stipulation for adequate protection approved by the bankruptcy court. In exchange for the release, Expeditors was granted a lien against an interest-bearing trust account of the same validity and extent as its secured lien against the Everex property, to the extent Expeditors could establish that it was a secured creditor of Everex.

4. Section 506(b) provides, in pertinent part:

To the extent that an allowed secured claim is secured by property the value of which ... is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506 (1994).

ing. The bankruptcy judge stated, according to the transcript:

> [C]ourse of dealing usually refers to previous dealings between parties which indicate the parties previously agreed on a specific issue that is now in dispute.
>
> . . . .
>
> There is no evidence that the parties ever agreed concerning the terms contained on the back of Expeditors' invoices or any other similar terms in previous dealings.
>
> . . . .
>
> I am unwilling to find that form language on the back of an invoice and a large number of shipments, without more, add up to an agreement for purposes of 9–203(1)(a).

By order filed August 3, 1995, the bankruptcy court determined that Expeditors did not have a security interest in Everex property. It further ruled that attorneys' fees were not available. Based on its oral findings and conclusions, referenced below, it granted the cross-motion of the Committee for partial summary judgment and denied Expeditors's cross-motion. A partial summary judgment was entered on August 3, 1995. On February 23, 1996, the bankruptcy court dismissed Expeditors' complaint. Expeditors timely appealed the February 23, 1996, order.

### ISSUES [5]

1. Whether the invoice terms and/or the parties' course of dealing established a security interest in favor of Expeditors in the goods which it possessed, pursuant to Article 9 of the Uniform Commercial Code ("UCC"), as adopted by California law.[6]

2. Whether Article 2 of the UCC applies to these facts by analogy to establish the existence of a security agreement by virtue of Everex's alleged consent to the invoice as

additional contract terms providing for a security interest.

3. Whether there was a contractual basis for an award of Expeditors' attorneys' fees pursuant to § 506(b) of the Code.

### STANDARD OF REVIEW

We review grants of summary judgment *de novo* to determine whether, viewing the evidence in a light most favorable to the nonmoving party, there are any genuine issues of material fact and whether the trial court correctly applied the law. *In re De Laurentiis Entertainment Group Inc.,* 963 F.2d 1269, 1271–72 (9th Cir.), *cert. denied sub nom. Carolco Television Inc. v. Nat'l Broadcasting Co., Inc.,* 506 U.S. 918, 113 S.Ct. 330, 121 L.Ed.2d 249 (1992).

■ Whether the actions of parties to a contract establish a course of conduct that adopts the terms of a writing is a question of law. *Step–Saver Data Systems, Inc. v. Wyse Tech.,* 939 F.2d 91, 104 (3rd Cir.1991); *Independent Machinery, Inc., v. Kuehne & Nagel, Inc.,* 867 F.Supp. 752, 765 (N.D.Ill.1994).

### DISCUSSION

#### 1. Security Interest Under Article 9.

■ The rules governing secured transactions are embodied in Division 9 of the California Uniform Commercial Code (Cal. Com.Code, §§ 9101—9508) "Security interest" is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." Cal.Com. Code § 1201(37)(a) (West Supp.1997). An agreement which creates or provides for a security interest is a "security agreement." Cal.Com.Code § 9105(1)(*l*) (West Supp. 1997). "No magic words or precise form are necessary to create or provide for a security interest so long as the minimum formal requirements of the [Commercial] Code are

---

**5.** Because of our disposition of this appeal, other issues need not be addressed. These include whether Expeditor's lien was perfected and whether the transfers of the security interests were exceptions to preference avoidance under § 547(c)(5).

**6.** The parties contest whether California or Washington law controls this case, Everex being

located in California and Expeditors in Washington. For purposes of this appeal, however, both California and Washington commercial codes are identical, thus, the Panel will cite to the California Commercial Code. *See* Wash.Rev.Code, Title 62A, §§ 62A.1–101 to 62A.11–109; Cal. Com. Code §§ 1101—15104.

met." *In re Amex–Protein Dev. Corp.*, 504 F.2d 1056, 1058–59 (9th Cir.1974). The agreement must describe the property in which the debtor has conveyed a security interest to the creditor. *In re Robert Bogetti & Sons*, 162 B.R. 289, 295 (Bankr.E.D.Cal. 1993). The term "security agreement" should be defined broadly. *In re County of Orange*, 179 B.R. 185, 193 (Bankr.C.D.Cal. 1995).

Cal.Com.Code § 9203 specifies the requisites for the attachment and enforceability of a security interest, in pertinent part, as follows:

> [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless all of the following are applicable: (a) The collateral is in the possession of the secured party pursuant to agreement, the collateral is investment property and the secured party has control pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral .... (b) Value has been given. (c) The debtor has rights in the collateral.

Cal.Com.Code § 9203 (West Supp.1997) (underscored language added in 1996).

■ "In other words, there must be a binding security agreement in order to make the security interest enforceable." *Komas v. Future Systems, Inc.*, 71 Cal.App.3d 809, 139 Cal.Rptr. 669, 670 (1977), as amended.[7]

It was undisputed that Everex did not sign a security agreement. Therefore, the issue before the bankruptcy court was whether the possession of the property by Expeditors was pursuant to an agreement that it have a security interest in the property. Expeditors states that the invoices combined with the parties' course of dealing was evidence of such an agreement.

■ As a general rule, there must be sufficient evidence of the creation of a security interest in the goods possessed, typically by evidence of written or oral agreement. J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 22–3, at 965 (3rd ed.1988). The parties' intent to create a security interest is a necessary element, although not specifically stated so in the commercial code. *In re Airwest Int'l*, 70 B.R. 914, 919 (Bankr.D.Hawai'i 1987).

■ "Agreement" means the "bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance...." Cal.Com. Code § 1201(3) (West Supp.1997). "Course of dealing" is defined as "a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Cal.Com.Code § 1205(1) (West 1964). It applies to all commercial contracts. *Capitol Converting Equip., Inc. v. LEP Transport, Inc.*, 965 F.2d 391, 395 n. 5 (7th Cir.1992).[8]

■ "Course of dealing, trade usage, and course of performance are all factors which are relevant to 'give particular meaning to and supplement or qualify terms of an agreement.'" *New West Fruit Corp. v. Coastal Berry Corp.*, 1 Cal.App.4th 92, 1 Cal.Rptr.2d 664, 668 (1991) (citing *Heggblade–Marguleas–Tenneco, Inc. v. Sunshine Biscuit, Inc.*, 59 Cal.App.3d 948, 131 Cal. Rptr. 183, 188 (Ct.App.1976)). Course of dealing evidence cannot create the agreement, but it may supplement the agreement by providing evidence of the parties' intentions. The bankruptcy court considered that important distinction in its ruling, as reflected in the hearing transcript, that course

---

**7.** UCC Comment 1 to Cal.Com.Code § 9203 makes it clear that a security agreement is required:

> Subsection (1) states three basic prerequisites to the existence of a security interest: agreement, value and collateral. In addition, the agreement must be in writing unless the collateral is in the possession of the secured party (including an agent on his behalf ... ). When all of these elements exist, the security agree-

ment becomes enforceable between the parties and is said to "attach."
Cal.Com.Code § 9203 (West 1990).

**8.** Whether a course of dealing exists between parties to a transaction is ordinarily a question of fact. *Capitol*, 965 F.2d at 395. Whether an agreement exists is also a question of fact. *Kreiger v. Hartig*, 11 Wash.App. 898, 527 P.2d 483, 486 (1974).

of dealing "refers to previous dealings between parties which indicate the parties previously agreed on a specific issue that is now in dispute."

Expeditors contends that the bankruptcy court erred by finding that the evidence did not prove its security interest when the invoice terms plainly granted such an interest and Everex agreed to the terms by allegedly operating subject to them and failing to object over the course of their business transactions.

■ Both California and Washington law recognize that a party acting pursuant to a contract, whether signed or unsigned, accepts the benefits of that contract and will be bound by it. *See J.A. Jones Constr. Co. v. Plumbers and Pipefitters Local* 598, 568 F.2d 1292, 1294–95 (9th Cir.1978); *Southern Cal. Acoustics Co. v. C.V. Holder, Inc.*, 71 Cal.2d 719, 79 Cal.Rptr. 319, 322, 456 P.2d 975 (1969).

■ Under the common law, "[s]ilence in the face of an offer is not an acceptance, unless there is a relationship between the parties or a previous course of dealing pursuant to which silence would be understood as acceptance." *C.V. Holder*, 79 Cal.Rptr. at 322, 456 P.2d 975; *see also Leslie v. Brown Bros. Inc.*, 208 Cal. 606, 283 P. 936, 942 (1929) (silence "unaccompanied by any act" was not sufficient to manifest acceptance of terms in a letter).

It has been held that the repetitive use of a standard form by one party, without a meeting of the minds or express agreement, is insufficient to establish a course of dealing. *See Step–Saver*, 939 F.2d at 104. In *Step–Saver*, a software producer included a disclaimer of warranty in a "Limited Use License Agreement" preprinted on the top of each software package. Although Step–Saver, the buyer, had never expressly agreed to the terms of the box-top license, the seller argued that it accepted the terms of the

license each time it opened up a package, especially since Step–Saver purchased and resold 142 copies of the software program between 1986 and 1987. The court analyzed the facts under the UCC's Article 1 provision for course of dealing and made the following legal conclusion: "[T]he repeated sending of a writing which contains certain standard terms, without any action with respect to the issues addressed by those terms, cannot constitute a course of dealing which would incorporate a term of the writing otherwise excluded under § 2–207." *Step–Saver*, 939 F.2d at 104.

Where there was no communication whatsoever concerning a security interest over the pertinent course of the relationship, the unilateral production of terms to Expeditor's liking was insufficient to create a contract.

■ There are numerous cases addressing the question whether an invoice term becomes part of the contract. Typically, like *Step–Saver*, those cases deal with a sale transaction governed by Article 2 and are not directly on point.[9] There are also cases concerning carrier liability which may be more applicable to this factual situation. At common law, a common carrier has two liabilities, one as an insurer for losses by accident or mistake, and the other for losses by default or negligence. *Franklin v. Southern Pac. Co.*, 203 Cal. 680, 265 P. 936, 938, *cert. denied*, 278 U.S. 621, 49 S.Ct. 24, 73 L.Ed. 542 (1928). Common law also recognized a possessory lien in favor of the common carrier. *In re Lissner Corp.*, 98 B.R. 812, 819 (N.D.Ill.1989) (at common law, a means of enforcing a carrier's lien was to retain possession of the property until the debt was paid). Both a carrier's liability and lien are common-law concepts incorporated into statutory schemes. They are separate from contractual rights, but may be modified by contract. *See* Cal.Com.Code § 7309 (West 1990) (contractual limitation of carri-

9. Both Expeditors and the Committee cite to unpublished memorandum decisions. The former is a district court case from the First Circuit; the latter is a district court case from the Ninth Circuit. The Panel may only cite to unpublished decisions for purposes of relevancy to this appeal under the doctrine of law of the case, *res judicata*

or collateral estoppel. *See* BAP Rule 13 and Ninth Circuit Rule 36–3. See also First Circuit Rule 36.1 and Rule 36.2(b)(6) (unpublished opinions may not be cited in unrelated cases.) As this appeal does not involve the same parties or the same litigation, the requisites for citing these opinions is not met.

er's liability); Cal.Civ.Code § 2144 (West 1985 & Supp.1997) (carrier's lien).

In *Boeing Co. v. U.S.A.C. Transport, Inc.,* 539 F.2d 1228, 1231 (9th Cir.1976), the Ninth Circuit Court of Appeals reviewed a case to determine if there was evidence of an "agreed upon practice" to limit the carrier's liability. *Id.* at 1230. Boeing sued the carrier for damage to a shipment of jet engines. The parties had engaged in a series of shipments where Boeing paid a released value of $2.50 per pound rather than actual value. Nevertheless, it sued the carrier for the actual value. The Court of Appeals affirmed the district court's conclusion that Boeing had agreed to limit the carrier's liability by shipping the engines on a released value basis.

Boeing's acceptance of an invoice charging the released value rate without objection was only one factor considered by the Court of Appeals in upholding that contractual rate. Other evidence of the parties' agreement included: (1) Boeing's agent signed a bill of lading without objection which contained a statement of released value; (2) Boeing had given the carrier a copy of its standard shipping instructions requiring rates for shipments of jet engines at a released value; (3) the carrier had filed and published established rates in accordance with those instructions; and (4) on one occasion when the carrier attempted to charge Boeing the actual value rate, Boeing returned the invoices with a note stating: "[I]t is a well-known fact that all Boeing engines move on lowest release value." *Boeing,* 539 F.2d at 1229–30, 1231.

In the instant case, there was no comparable evidence of an express agreement by Everex to the general lien terms.

Expeditors contends that the Seventh Circuit case, *Capitol,* is dispositive of this appeal in its favor. Capitol sold machinery which was transported to manufacturers by LEP Transport ("LEP"). The parties had conducted "hundreds of transactions" over approximately 10 years, pursuant to an oral agreement. The parties had not agreed to nor discussed any terms regarding LEP's liability for lost or damaged goods. However, on the reverse side of each invoice issued by LEP was language limiting its liability.

The problem arose with one shipment that was never delivered, and Capitol sued for breach of contract, seeking damages.

The Court of Appeals affirmed the district court's summary judgment in favor of LEP's limited liability. It held that course of dealing was a factual issue, which could "supplement" a later agreement and "fill the void" if an agreement is silent on a particular term. *Capitol,* 965 F.2d at 394–95 (citing Ill. Rev. Stat. ch. 26, § 1–205(3)). The appellate court determined that the parties' prior, lengthy course of dealing established that LEP's limited liability was part of their bargain.

We do not see a need to apply *Capitol*'s expansive reading of § 1–205(3) to create an agreement by supplementation where there were no existing terms concerning a security interest in the transported goods. *Capitol*'s holding suggests that carrier liability is an inherent term of a transportation contract, else why would the parties' course of dealing "fill a void" in the oral contract. A carrier's lien is similarly inherent. However, a party's inherent right to a common-law or statutory lien is independent from its bargained-for contractual rights. 13 Am.Jur.2d, Carriers § 497, at 961 (2d ed.1964). In addition, an inherent term providing for a carrier's lien is not comparable to a provision for a security interest, governed by Article 9. *See Lissner,* 98 B.R. at 818 n. 2 ("[C]arrier's liens are specific liens which attach to goods involved in one transaction rather than general liens or security interests."). In contrast, the definition of "liability" presumably would be the same under the common law and in the parties' contract.

■ Thus, notwithstanding the existence of a statutory lien, the contract for a general lien required proof of such an agreement at the outset, as in *Boeing,* or usage of trade evidence:

[A] carrier may establish its right to a general lien by virtue of an express contract or on proof of a general usage of trade to that effect, although the evidence of an alleged usage of trade must be so strong as to afford a presumption that it was commonly known and that the shipper

must necessarily have had notice of and assented to it.

13 AM.JUR.2D, Carriers § 498, at 962 (2d ed.1964).

■■■ In this case, Expeditors and Everex had been doing business for about one and one-half years. They had never discussed the terms of the invoice nor negotiated for a security interest. Everex had never expressly acknowledged the invoice terms by accepting or objecting to them, nor did it take actions which acknowledged Expeditors' alleged general lien on the goods. Its only pertinent acts were its payment of the invoices and silence as to the added terms. Prior to the preference period Expeditors did not claim nor attempt to enforce a general lien against the property.

Expeditors presented no usage of trade evidence. The fact that Everex accepted and paid the invoices was evidence that the parties had a contract for shipment of goods. However, it was not conclusive evidence that Everex consented to the terms granting Expeditors a general lien. These facts did not amount to course of dealing as supplementary contractual terms.

### 2. Security Agreement Pursuant to Article 2.

Expeditors contends that Cal.Com.Code § 2207(2) (West 1964 & Supp.1997), governing additional terms in an acceptance or confirmation, applies by analogy [10] to establish that the additional invoice terms were part of the contract for its services.

■■■ Article 2 does not apply to a transaction intended to be a "security transaction" because Article 9 governs secured transactions. See Cal.Com.Code § 2102 (West 1964) (this section does not apply to a sale intended to operate only as a security transaction). Even nonconsensual security interests which arise from the sales provisions are governed by Article 9. See Cal.Com. Code § 9113 (West 1990). In addition, it is well established that Article 2 governs transactions in goods in a sale context, not a commercial service transaction. See Manes Org.. Inc. v. Standard Dyeing and Finishing Co., 472 F.Supp. 687, 690 n. 3 (S.D.N.Y.1979).

The transaction here was not a sale, and the only comparison to § 2207(2) is that it involved merchants and additional terms submitted on a preprinted form. However, additional credit terms involving a secured interest are distinguishable from terms of purchase orders and acknowledgment forms. Expeditors has not provided any persuasive authority for applying § 2207 to a nonsale, *secured* transaction.[11] We decline to do so.[12]

### 3. Attorneys' Fees

Expeditors requested attorneys' fees pursuant to § 506(b), which allows an oversecured creditor to receive its attorneys' fees as provided for in an underlying agreement. As discussed above, Expeditors did not have

---

**10.** The "policy approach" to deciding whether to apply Article 2 to nonsale transactions is "to determine what policy objectives the particular Code section in question implicates, and then, in light of those policies, determine whether the particular facts of the transaction invite the application of the section by analogy." J. WHITE & R. SUMMERS, UNIFORM COMMERCIAL CODE § 1–1 at 25 (3rd ed.1988).

**11.** Expeditors has cited a California appellate court opinion, which stated in dicta, that *Capitol*, a nonsale case of a manufacturer suing a transporter for damages, was decided under § 2207(2):

The *[Capitol]* court did not specifically rely on Uniform Commercial Code section 2–2207, subdivision (2) but it is clear from the facts of the case the additional terms limiting liability formed part of the contract under the provisions of that section.

*Transwestern Pipeline Co. v. Monsanto Co.,* 46 Cal.App.4th 502, 53 Cal.Rptr.2d 887, 896 (1996).

*Capitol* did not refer to § 2207 but held that the parties' course of dealing supplemented the oral contract by adding liability terms. It used this analysis because it concluded that the commercial code's course of dealing provisions, found in Article 1, applied to all commercial contracts, not just sales contracts. *Capitol*, 965 F.2d at 395 n. 5. Thus, it clearly recognized that its facts were not applicable to the sales provisions of the commercial code. Furthermore, *Capitol* did not involve a transaction for a security interest.

**12.** Article 2 provides its own provisions for determining the existence and meaning of a contract pursuant to course of performance or the parties' conduct which Expeditors has not sought to apply in this case. See Cal.Com.Code § 2207(3) (West 1964) and § 2208 (West 1964).

a secured interest in the goods. Specifically, there was no security agreement pursuant to Article 9 under which attorneys' fees could be awarded to Expeditors on the basis of an oversecured claim. *In re Le Marquis Associates*, 81 B.R. 576, 578 (9th Cir. BAP 1987).

## CONCLUSION

The evidence consisting of Everex's receipt and payment of invoices containing terms for a general lien in the goods in favor of Expeditors did not amount to an agreement for such a security interest, pursuant to Cal. Com.Code § 9105(1)(1). As a matter of law, the repetitive sending by Expeditors to Everex of terms which Expeditors wished to be made part of the oral contract was not evidence of course of dealing because an agreement did not exist as to the security interest which could be supplemented by such evidence. In addition, Article 2 of the commercial code did not apply to the secured, service transactions involved. As a result, Expeditors did not have a security interest or lien in property of the estate. It was not entitled to attorneys' fees under § 506(b). The partial summary judgment in favor of the Committee and order dismissing Expeditors' complaint is **AFFIRMED.**