[No. A083666. First Dist., Div. Three. May 26, 1999.]

ROBERT M. CASSEL, Plaintiff and Respondent, v.
THEODORE A. KOLB et al., Defendants;
UNION BANK OF CALIFORNIA, N.A., Third Party Claimant and
Appellant.

570

## COUNSEL

Sawamura Nishimi & Chu and John Chu for Third Party Claimant and Appellant.

Law Offices of Joel D. Adler, Joel D. Adler and Roger T. Ritter for Plaintiff and Respondent.

## OPINION

**WALKER, J.**—Third party claimant and appellant Union Bank of California, N.A. (Union Bank or the bank) appeals the trial court's judgment denying its third party claim, which sought to establish a superior security interest in a securities account levied upon by respondent Robert M. Cassel. On April 14, 1998, Cassel obtained a money judgment against his former law partnership, Sullivan, Roche & Johnson (SR&J). Pursuant to the judgment, a notice of levy and writ of execution were served on Van Kasper & Co., which held a securities trading account for SR&J containing common stock shares in a company called Finet Holdings Corporation. Finet had transferred the stock to SR&J in payment for legal services rendered to Finet. In response to the levy, Union Bank filed its third party claim, asserting it was a secured creditor of SR&J with a secured and perfected interest in SR&J's levied upon securities account. Union Bank contended its interest in the account was superior to Cassel's by virtue of a filed UCC-1 financing statement[1] which included as secured collateral SR&J's accounts receivable and proceeds therefrom. It further contended that the shares of Finet stock, any cash accumulated from selling those shares, and any other

---

[1] This statement, provided for in the California Uniform Commercial Code as a vehicle for perfecting a security interest is commonly referred to as a UCC-1.

shares of stock acquired from proceeds of Finet stock sales constituted proceeds of SR&J's accounts receivable for Finet, and therefore fell within the collateral described in the filed UCC-1 financing statement. After hearing, the trial court denied Union Bank's third party claim on the ground that the bank had not properly perfected its security interest in the Finet stock. The trial court also ordered the third party claim stricken "for lack of foundation." We hold that Union Bank's security interest in the securities account was perfected by its UCC-1 filings, giving it priority over Cassel.[2] In addition, we conclude the trial court abused its discretion in denying the bank an opportunity to establish a foundation for its evidence. We reverse.

## Facts[3]

At the time Union Bank filed its third party claim, SR&J was indebted to it on two loans with a current principal balance of $524,000. These loans were evidenced by two promissory notes executed by SR&J through its general partners. To secure the loans, SR&J gave the bank a security interest in, among other items, its accounts receivable and proceeds thereof. On November 5, 1990,[4] the bank filed a UCC-1 financing statement with the Secretary of State in Sacramento, the specifics of which will be discussed below. In 1995 it filed a continuation of its original UCC-1. And on February 20, 1998, it filed a supplemental UCC-1, which will also be addressed fully below. It was pursuant to these documents that the bank filed a third party claim asserting an interest superior to Cassel's, the levying judgment creditor. Cassel opposed the third party claim on the substantive ground that Union Bank, which admittedly was a secured creditor of SR&J, did not have a perfected security interest in the accounts receivable and proceeds therefrom due to flaws in the UCC-1 filings. Because an unperfected security interest is subordinate to the rights of a levying judgment creditor under California Uniform Commercial Code[5] section 9301, subdivision (1)(b), Cassel contended the bank's third party claim must fail. Cassel also objected to the third party claim "on the grounds of hearsay, conclusion, incompetence and lack of foundation." After hearing, the trial court denied Union Bank's third party claim on the grounds asserted by Cassel. Judgment was entered instructing the sheriff to proceed with the levy.

---

[2]In the trial court, Cassel contended that he had a priority right in the securities even if the bank's security interest was perfected by filing, because he had control over the securities. He has not made that argument in his response to the appeal.

[3]This section is intended to provide an overview of the issues presented. To avoid unnecessary repetition we will reserve a recitation of many factual specifics for the section where those specifics are discussed and analyzed.

[4]This statement was filed before the execution of the security agreement, a practice specifically allowed by the Uniform Commercial Code. (Cal. U. Com. Code, § 9402, subd. (1).)

[5]Unless otherwise specified, all further statutory references will be to the California Uniform Commercial Code.

## Standard of Review

■ Whether the bank's UCC-1 financing statements were adequate to perfect its security interest in the Van Kasper securities account is a question of law. We therefore review that aspect of the trial court's ruling de novo. (*Conway* v. *City of Imperial Beach* (1997) 52 Cal.App.4th 78, 83 [60 Cal.Rptr.2d 402].) We apply an abuse of discretion standard to the trial court's refusal to allow the bank to cure the foundational problem, if one existed.

## Discussion

### A. *Did the Bank Have a Perfected Security Interest in SR&J's Accounts Receivable and the Proceeds Therefrom?*

■ In general, and in the matter before us, a security agreement between two parties is effective to create a security interest in specified collateral as against purchasers of the collateral and creditors. (§ 9201.) However, in most cases, and in this one, a UCC-1 financing statement must be filed to perfect the security interest created by the security agreement. (§ 9302.) A financing statement is adequate to perfect a security interest in collateral covered by the security agreement if it contains the names of the debtor and the secured party, is signed by the debtor, gives an address for the secured party so further information can be obtained concerning the security interest, provides the debtor's mailing address, and "*contains a statement indicating the types, or describing the items, of collateral.*" (§ 9402, subd. (1), italics added.) Additionally, a financing statement which complies with these requirements, but is signed *only by the secured party* is sufficient to perfect a security interest in proceeds received from the sale or other disposition of collateral "if the security interest in the original collateral was perfected." (§ 9402, subd. (2)(b).)

These general rules frame the issues we are called upon to decide. First, did Union Bank's original UCC-1 financing statement filed in 1990 meet the requirements of section 9402, subdivision (1) by adequately indicating the types or describing the items of collateral secured by the security agreement? And second, what effect did the 1998 UCC-1 filing have on the perfection of the bank's security interest in the Van Kasper securities account?

### 1) *Sufficiency of 1990 UCC-1 to Perfect Security Interest in Accounts Receivable*

The trial court agreed with Cassel that the bank's original 1990 UCC-1 did not adequately describe the secured collateral, so that the security

interest in that collateral was never perfected. Because the language of the financing statement is crucial to our analysis, we will quote much of it in full. The UCC-1 form utilized by the bank is a preprinted form. Section 4 contains the following relevant preprinted language: "This FINANCING STATEMENT covers the following types or items of property . . . ." In the box provided the bank entered the following: "All of Debtor's equipment now owned or hereafter acquired, including but not limited to machinery, machine parts, furniture, furnishings, and all tangible personal property used in the business of the Debtor and all such property which is or is to become fixtures on real property, and all improvements, replacements, accessions, and additions thereto, wherever located, and all proceeds thereof arising from the sale, lease, rental, or other use or disposition of any such property, including all rights to payment with respect to insurance or condemnation, returned premiums, or any cause of action relating to any of the foregoing. [¶] *See Schedule A hereto, all terms of which are incorporated by this reference.*" (Italics added.)

The attached schedule A looks like this:

"Schedule A

"to
"Financing Statement

"dated <u>10-12-90</u>

"Sullivan, Roche & Johnson

"COLLATERAL

" 'Collateral means all Debtor's Accounts, General Intangibles, and Rights to Payment now owned or hereafter acquired, wherever located, and whether held by Debtor or any third party, and all royalties, proceeds and products thereof, including all insurance and condemnation proceeds, and all Records.'

" 'Accounts means all rights to payment for goods sold or leased by Debtor or for services rendered by Debtor, which rights are not evidenced by an instrument or chattel paper, whether or not earned by performance.'

" 'General Intangibles means all personal property of Debtor other than goods not otherwise defined as Collateral, including without limitation all interests or claims in insurance policies; literary property; tradenames, trade-name rights; trademarks, trademark rights, copyrights, patents, and all applications therefor; licenses, permits, franchises and like privileges or rights issued by any governmental or regulatory authority; income tax refunds; claims and causes of action.'

" 'Rights to Payment means all Debtor's instruments, contract rights, documents, chattel paper and all other rights to payment other than the Accounts, including without limitation all rights to payment under any commercial or standby letter of credit.'

"[']Records means all Debtor's computer programs, software, hardware, source codes and data processing information, all written documents, books, invoices, ledger sheets, financial information and statements, and all other writings concerning Debtor's business.'

"Terms not specifically defined herein have the meanings proscribed in the Uniform Commercial Code."

■ As acknowledged by the Uniform Commercial Code comment to section 9-402 (Cal. U. Com. Code, § 9402), the purpose of requiring a description of collateral by type or item in the financing statement, is to put third parties on notice "that the secured party who has filed may have a security interest in the collateral described. Further inquiry from the parties concerned will be necessary to [make disclosure]." (23C West's Ann. Cal. U. Com. Code (1990 ed.) foll. § 9402, com. 2, p. 538.) This "notice inquiry" filing allows interested parties to obtain the relevant information regarding the security agreement from the parties involved in the transaction without the necessity of filing entire security agreements. (*In re Miguel* (Bankr. E.D.Cal. 1983) 30 B.R. 896, 898.) It places third parties on notice that another party may have a security interest in the collateral and that further inquiry is required. (*Ibid.*) The notice requirements have been liberalized to avoid overly technical applications. "[T]he policy of this Article [is] to simplify formal requisites and filing requirements and is designed to discourage the fanatical and impossibly refined reading of such statutory requirements in which courts have occasionally indulged themselves." (23C West's Ann. Cal. U. Com. Code, *supra*, foll. § 9402, com. 9, p. 540.) As such, a financing statement that is in substantial compliance with section 9402 "is effective even though it contains minor errors which are not seriously misleading." (§ 9402, subd. (8).) The only requirement is that the description of the secured property "reasonably identif[y]" the item described; it need not do so specifically. (§ 9110.)

■ Cassel asserts that Union Bank's UCC-1 failed to describe *any* collateral other than the office equipment described in the section 4 box of the preprinted form. He contends that the document attached as schedule A was nothing more than a list of definitions of the terms "collateral," "accounts," "general intangibles," "rights to payments," and "records." He likens the information contained in schedule A to that contained in an attachment to the UCC-1 filed in *In re Softalk Pub. Co., Inc.* (9th Cir. 1988) 856 F.2d 1328 (*Softalk*), which the court held did not comply with the

statutory requirements for perfecting a security interest. In that case, Softalk gave its promissory note and security interest in its accounts receivable in exchange for a bank loan. In the space provided on the preprinted UCC-1 form for listing the types òr items of property covered, the bank wrote " 'See Attached.' " Attached was a separate sheet which specified that the debtor was granting the bank "a security interest in all of the following types or items of property ('Collateral' herein) . . . and proceeds thereof." The attachment went on to define the term "proceeds" but failed to define or specify the collateral covered. Rather, at the point where it appeared a description of collateral would follow, there was nothing. The paragraph ended with the word "collateral" followed by a colon and nothing else. (*Id.* at p. 1329.)

The court in *Softalk* recognized that the purpose of the financing statement was to give notice to other creditors or potential creditors that another may have a security interest in certain of the debtor's assets, that it need only alert third parties to inquire further and that it need not, therefore, provide exhaustive detail. (*Softalk, supra*, 856 F.2d at p. 1330.) It held, however, that even the most liberal reading of section 9402 imposed "a few minimal requisites," one of them being that the financing statement contain a statement identifying or describing the collateral. In its estimation, the UCC-1 with which it was presented failed in this respect. It adequately identified or described "proceeds," but did not describe any "collateral" and was therefore insufficient to perfect a security interest in any collateral. (856 F.2d at pp. 1331-1332.)

Union Bank's UCC-1 does not suffer the same deficiencies. The first page directs the reader to schedule A. Schedule A lists "COLLATERAL" at the top of the page, and proceeds to define that item to include "Debtor's Accounts," "General Intangibles," and "Rights to Payment" each term which is then also defined. The very fact that "collateral" is defined suggests that it is the subject of a security agreement. Whether ambiguous or not, this page clearly gives notice to a third party that such items might be secured by another, and that further inquiry is necessary. This is all that is required by section 9402. (See Clark, The Law of Secured Transactions Under the Uniform Commercial Code (rev. ed. 1993) § 2.09[5] [b], p. 2-100, fn. 350 [ambiguities in financing statements are to be construed in favor of the secured party].) We hold, therefore, that the original UCC-1 was adequate to perfect Union Bank's security interest in SR&J's accounts receivable.

2) *Effect of Perfected Security Interest in Accounts Receivable on Proceeds*

Historically, the only way to perfect a security interest in a security, such as stock, was to have possession or control over the security instrument. (See

former § 8321, repealed by Stats. 1996, ch. 497, § 8, eff. Jan. 1, 1997.) This was changed in 1997, when revised legislation allowed a security interest in securities to be perfected by filing a UCC-1 financing statement. (§ 9115, subd. (4)(b).) Thus, at the time Union Bank filed its third party claim, a security interest in a securities account could be perfected by filing. ▪ This point is important to an analysis of the next question we must resolve: Given that the bank had a perfected security interest in SR&J's accounts receivable, what was its status with regard to the proceeds of the accounts receivable collateral, when those proceeds were in the form of securities? We hold that Union Bank had a perfected security interest in the proceeds in the form of Finet stock or other securities by operation of law and by virtue of its 1998 UCC-1 filed financing statement.

Section 9306 addresses a secured party's rights to proceeds of collateral. It defines proceeds to include "whatever is received upon the sale, exchange, collection or other disposition of collateral or proceeds. . . ." (§ 9306, subd. (1).) With regard to perfection of a security interest in proceeds, section 9306, subdivision (3)(a) provides in relevant part that "[t]he security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected 10 days after receipt of the proceeds by the debtor unless any of the following apply: [¶] (a) A filed financing statement covers the original collateral and the proceeds are collateral in which a security interest may be perfected by filing in the office or offices where the financing statement has been filed . . . ." This language is clear. Without further action by the secured party, a security interest in proceeds (here the Finet stock) will be perfected if the interest in the original collateral (here the accounts receivable) was perfected, so long as a filed UCC-1 covers the original collateral (we have held it does) and the proceeds are collateral as to which a security interest could also be perfected by filing. As we explained above, it is now the law that a security interest in securities (the proceeds here) can be perfected by filing. Thus, under section 9306, subdivision (3)(a), Union Bank's security interest in the Finet stock was perfected by operation of law.[6]

Additionally, Union Bank perfected its security interest in the accounts receivable proceeds by filing a UCC-1 financing statement in February 1998, two months before Cassel sought to levy on the Van Kasper securities

---

[6]Cassel contends section 9306, subdivision (3)(a) is inapplicable because at the time the original UCC-1 was filed in 1990 a security interest in stock could not be perfected by filing. The revisions to the code pertaining to security interests in securities were intended to be applied to "transactions and events that occurred prior to enactment." (23 West's Ann. Cal. U. Com. Code (1999 supp.) foll. § 8603, com., p. 70; see *In re County of Orange* (Bankr. C.D.Cal. 1997) 219 B.R. 543, 551.)

account. The 1998 financing statement stated that it covered "[a]ll of the Debtor's <u>securities</u>, whether certificated or uncertificated, that are <u>proceeds</u> of Debtor's existing and original collateral, which is comprised of equipment, accounts receivable, general intangibles and 'Rights To Payment' and any proceeds thereof . . . ." (Emphasis in original.) The 1998 UCC-1 was signed only by the bank as secured party and not by the debtor, as permitted by section 9402, subdivision (2)(b) to perfect a security interest in proceeds received from the sale or other disposition of collateral "if the security interest in the original collateral was perfected."

Cassel contends this apparently clear provision was inappropriately used by the bank. He asserts the bank's 1998 financing statement should have made specific reference to section 8603, a transitional provision in the new legislation. Cassel's argument makes little sense in the scenario before us. Accordingly, we do not dwell on it, other than to point out that section 8603 applies specifically to instances where a secured party had a perfected interest in securities on the date the new provisions became operative, but under the new provisions would no longer be secured. The section provides a four-month transitional period during which appropriate action can be taken to perfect the security interest. Union Bank found itself in a position opposite that contemplated by section 8603. As the bank admits, it was in an unperfected position as to the securities until the new legislation became operative. As we have discussed, its position then became perfected by operation of section 9306, and by filing the 1998 UCC-1 specifying the securities as proceeds of its accounts receivable collateral.

## B. *Trial Court's Evidentiary Ruling*

On May 1, 1998, Union Bank filed its third party claim with the San Francisco Sheriff. As required by Code of Civil Procedure section 720.230, the claim included all relevant information to support the claim, and included copies of all required documentation, such as the security agreement and the financing statements. As also required by the code, the claim was executed under oath. It stated: "I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, based upon my personal knowledge, and that if called upon, I could testify competently thereto." It was dated and signed by Richard D. Morris.

Pursuant to Code of Civil Procedure section 720.320, Cassel's attorney, John Poppin, filed a declaration in opposition to the third party claim, in which he asserted the invalidity of the claim on the merits, and in which he objected to the third party claim "on the grounds of hearsay, conclusion, incompetence and lack of foundation. A third party claim must be made

under penalty of perjury. The third party claim . . . is invalid because it fails to set forth any facts establishing the basis of the alleged personal knowledge of the declarant, or even his capacity or title."

On May 15, 1998, Union Bank filed a petition in the superior court for hearing on the third party claim. By stipulation, the hearing was set for June 11, 1998. Each side filed hearing briefs on or before the date of the hearing. Cassel's brief renewed his foundational objection, contending that without a showing of personal knowledge, the oath and the documents were meaningless and subject to exclusion. The bank's brief asserted the objections were trivial, because the parties had been involved in litigation on another matter for two years, so that Cassel knew Richard Morris's title and position with the bank, and was in possession of the documents attached to the third party claim as a result of discovery in the other action. The bank asked that, if necessary, an evidentiary hearing be set to allow it to put on testimony to meet the objections, and that it be permitted to augment its third party claim, as permitted by the code in the interests of justice. (Code Civ. Proc., § 720.350.)

Although not established definitively by the record, the hearing transcript suggests that the trial court rendered a tentative ruling prior to the hearing on the third party claim, which was substantially the same as the order and judgment ultimately entered after hearing, including the foundational ruling sustaining Cassel's objection. At the hearing, counsel for the bank made an offer of proof that Richard Morris was present in court and if called to testify he would state that he is a vice-president in Union Bank's special assets department, that he had reviewed the pertinent loan documents including those attached to the third party claim, and that he would verify that all of the facts stated in the third party claim were within his personal knowledge and made under penalty of perjury. Counsel then asked that Morris be permitted to testify in the interests of justice. The trial judge responded: "Are you saying, basically, although he lacks personal knowledge, these are business records and, therefore, everything comes in? I'm not quite sure. I don't think there's any—he doesn't have personal knowledge of any of this, does he?" Counsel responded that Morris had personal knowledge that the documents were bank records and that beyond that the documents would speak for themselves. Discussion on another topic ensued, then the court announced that it was denying the third party claim on the grounds stated in the tentative ruling.  ▆  By denying the third party claim, the trial court effectively denied the bank's offer of proof and its request to have Morris testify. We hold the denial was an abuse of discretion.

Third party claims are, by nature, summary proceedings. They are not so summary, however, that the parties are denied the right to a trial with all of

its due process protections.[7] Nor should they be so summary as to deny a party a right to a fair trial. In this instance, Union Bank's third party claim facially complied with the statutory requirements that it be signed under oath. Once Cassel objected that the claim was not based upon the declarant's personal knowledge, the bank should have been given an opportunity to respond. (Evid. Code, § 702, subd. (b) [A witness's personal knowledge of a matter may be shown by any otherwise admissible evidence, including his own testimony.].) Under the circumstances, proof of the declarant's personal knowledge, or lack thereof, was easily obtained, without any delay or continuance.[8] The witness was present in court, and the foundational questions would have taken a few minutes. There was no reasonable basis for denying the bank that opportunity.

## Disposition

The judgment denying Union Bank's third party claim is reversed. The matter is remanded to the trial court for receipt of evidence to meet Cassel's foundational objection and for entry of judgment consistent with this opinion. Appellant to recover costs on appeal.

McGuiness, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied June 23, 1999, and respondent's petition for review by the Supreme Court was denied September 15, 1999.

---

[7]The third party claim provisions provide that a third party claimant has no right to a jury trial, but judgment is entered following a court trial on the matter. (Code Civ. Proc., §§ 720.390, 720.410.)

[8]It appears from the record that Morris was competent to testify to the contents of the crucial documents, so that the foundational objection would have been adequately met and overruled.