[No. B224806. Second Dist., Div. One. May 23, 2012.]

OXFORD STREET PROPERTIES, LLC, Plaintiff and Respondent, v. REHABILITATION ASSOCIATES, LLC, et al., Defendants; CITIBANK, N.A., Third Party Claimant and Appellant.

COUNSEL

Stroock & Stroock & Lavan, Julia B. Strickland, Scott M. Pearson and Samuel B. Lutz for Third Party Claimant and Appellant.

Russ, August & Kabat, Matthew A. Rips and Nathan D. Meyer for Plaintiff and Respondent.

OPINION

**JOHNSON, J.**—Third party claimant Citibank, N.A. (Citibank), appeals from a judgment denying its petition to levy on deposit account funds held by City National Bank (CNB) and Provident Title (Provident) in the name of Downtown Lofts, LP, in which Citibank claims a security interest. Plaintiff Oxford Street Properties, LLC (Oxford), and defendant Rehabilitation Associates, LLC (Rehab), formed a partnership known as Downtown Lofts, LP, in 2003 to develop downtown loft property; Rehab bought out Oxford's partnership interest in Downtown Lofts in 2007 with proceeds from a refinance of the property by Citibank. As part of the refinance, Citibank took a trust deed and security interest in the partnership's real and personal property and later foreclosed on these interests. However, due to certain

conditions placed on the sale of Oxford's partnership interest in Downtown Lofts, some of the Citibank loan proceeds were never disbursed to Oxford; Citibank claimed a security interest in the funds and sought to levy on them.

At the same time, due to numerous defalcations by Rehab and its principal in their dealings with Oxford in connection with the partnership, the matter proceeded to arbitration in which the arbitrator awarded Oxford $30 million in compensatory and punitive damages, as well as the funds on deposit in the two accounts in which Citibank claimed a security interest. The trial court denied Citibank's petition, finding that the two deposit accounts were the property of Oxford and thus Citibank never acquired a security interest in them. We affirm.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### 1.   *Background: Development of Main Mercantile Lofts*

Oxford acquired an option to purchase the Main Mercantile Building (620 South Main Street) in downtown Los Angeles, and intended to redevelop the building as live-work units. Oxford's principal, Frank Gamwell, met Lance Robbins, principal of Rehab, and the two decided to form a partnership to redevelop the property as equal partners. Subsequently, Oxford and Rehab, along with a Gamwell-controlled entity known as Prudential Construction and Management, Inc., formed a general partnership known as "Downtown Lofts LP" to redevelop the property.

Oxford acquired a construction loan from United Commercial Bank (UCB), and Gamwell guaranteed the loan. Around this time, the parties restructured the partnership pursuant to the second amended partnership agreement such that Rehab became a limited partner; Oxford remained a general partner and also became a limited partner. As a result of the restructuring, Rehab obtained a 50 percent interest in the partnership as a limited partner; Oxford obtained 49.5 percent interest in the partnership as a limited partner, and Oxford obtained a 0.5 percent interest as a general partner.

Construction of the lofts began in late 2003 or early 2004, and encountered delays and changes in the plans due to Robbins's conduct. In 2007, Oxford completed redevelopment of the building, but at such great expense that Oxford and Gamwell were on the brink of financial ruin. Gamwell sold all his available assets, mortgaged his home, and procured a high-interest personal loan for $1 million that was due in August 2007.

## 2. *Sale of Oxford's Partnership Interest; Citibank Refinancing*

On July 27, 2007, with the $1 million personal loan about to become due, Gamwell agreed to sell his partnership interest to Rehab for $3 million. Pursuant to the partnership sales agreement (PSA), Fedora Investment Corp. (Fedora), a Robbins-controlled company, became the general partner of Downtown Lofts; Rehab remained a limited partner, and Oxford retained a 0.5 percent limited partner interest until the final payment from Rehab.

The PSA provided that a $2.5 million payment would be made to Oxford from the then pending refinance of the property through Citibank when such refinancing was completed; the remaining $500,000 due Oxford would be paid two years after the execution of the PSA, subject to certain terms and conditions set forth therein, but $100,000 was due unconditionally in August 2009.

In August 2007, Citibank loaned $11.7 million to Downtown Lofts. As security for the loan, Downtown Lofts gave Citibank a deed of trust on the property and a security interest in certain of Downtown Lofts's personal property.[1] Prior to the closing of the Citibank loan, new accounts were opened for the partnership.

The settlement statements for the Citibank loan dated August 23, 2007, shows that $2,325,786.37 was disbursed to the buyer (Downtown Lofts), and $700,000 (under the heading "Loan Charges to Citibank") was set aside for a "lender holdback." These two sums, after certain deductions described below, were disbursed to the CNB and Provident accounts, leaving balances in those accounts of $210,789.99 and $277,604.44, respectively.

The Provident account was used to pay lien claims. Provident insured title to the building free and clear of any exceptions for mechanic's lien rights, and required Gamwell to promise to it that Gamwell and his construction company would not make any lien claims against the building. Provident held back $700,000 from the Citibank refinancing for this purpose. As a result, contemporaneously with the closing of the Citibank loan, out of this $700,000 holdback, more than $400,000 was disbursed, leaving a balance of $277,737.69 remaining in the Provident account. Oxford was unable to obtain these funds because Robbins's signature was required and Robbins refused to release the funds.

---

[1] Citibank's UCC-1 financing statement filed August 27, 2007, described the debtor as "Downtown Lofts, a California limited partnership" and the collateral as including "[a]ll interests which [Downtown Lofts] now has or may hereafter acquire in [¶] . . . [¶] (G) all accounts; deposit accounts . . . in which [Downtown Lofts] now has or may hereafter have an interest arising out of, or relating to, the acquisition, development, ownership, management or use of said real property . . . ."

The CNB account held the remainder of the proceeds of the purchase price for Oxford's partnership interest. According to Gamwell, upon the closing of the Citibank loan, Provident paid off the construction loan, and paid $2,325,786.37 into the partnership CNB account for payment to Gamwell. The CNB account had been used for redevelopment of the building, was currently dormant, and had a balance of $1,000. After the closing, the CNB account was used to pay Oxford for its partnership share and a balance of $229,237.19 remained in the CNB account.[2] These funds were to remain in the account until Robbins was satisfied that certain insurance conditions on the property had been met; however, Robbins never transferred the funds to Oxford.

After the Citibank loan on the building closed, Oxford transferred its partnership interests as set forth in the PSA.

### 3. *Arbitration Proceedings, Phase I and Phase II*

On October 23, 2007, Oxford commenced an action in superior court entitled *"Oxford Street Properties, LLC v. Rehabilitation Associates, Fedora Investment Corp., et al.,"* case No. BC379634 (main case). Oxford's first amended complaint in the main case, filed November 6, 2007, sought rescission of the second amended partnership agreement, rescission of the PSA and damages and other relief.

The matter was arbitrated in two phases. Phase I took place during November 2008, and resulted in a "Partial Final Award issued December 29, 2008." Phase I of the arbitration considered whether the second amended partnership agreement and PSA should be rescinded. The partial final award found for Oxford on its rescission claims, and awarded $1,646,212 in restitution. Pursuant to the partial final award, Rehab was required to transfer assets to Oxford, including sole ownership of the Downtown Lofts property.

The partial final award was confirmed as a judgment in the superior court on February 26, 2009.

Phase II arbitration proceedings took place in March 2009. The corrected final award (CFA) issued in the phase II proceedings found that Rehab had failed to cooperate in the transfer of the Downtown Lofts property to Oxford as ordered in the arbitrator's phase I partial final award, and instead permitted

---

[2] The corrected final award in the arbitration proceedings lists the figures as $277,604.44 in the Provident account and $210,789.99 in the CNB account. In other places in the record the balance of the CNB account is listed as $229,237.19. The record does not explain the discrepancy in the amounts in the CNB account, but Oxford has not contested the correctness of the amount in the CNB account as listed in the final award.

the Citibank loan on the property to go into default in December 2008 and proceed to judicial foreclosure; further, Rehab had "fail[ed] to consent to the transfer of funds held by Provident ($277,604.44) and City National Bank ($210,789.99) which funds were and are the property of Oxford"; Rehab "[d]irect[ed] Citibank to the Provident Title funds so that Citibank would be able to claim them after the default was declared on the take-out loan rather than consenting to the earlier release of those funds to Gamwell and Oxford, to whom they belonged"; and failing to inform Oxford of the foreclosure on Citibank's deed of trust and related proceedings.

As a result of Rehab's conduct, the arbitrator in the phase II proceedings found it was no longer possible to restore Oxford to the ownership of the property; thus, the arbitrator awarded compensatory damages to Oxford in the amount of $15.9 million; release to Oxford of the sums of $210,789.99 and $277,604.44 "representing funds on deposit for the benefit of [Oxford] at City National Bank and Provident Title, respectively"; punitive damages in the sum of $10 million; and attorneys' fees and costs.

The superior court confirmed the phase II corrected final award on June 29, 2009, and entered judgment for Oxford. In addition to making the compensatory and punitive damage awards, the court's final judgment awarded Oxford $277,604.44 in the Provident account and $210,789.99 in the CNB account.

### 4. Citibank's Foreclosure

#### (a) The Foreclosure Action

While the arbitration in the main case was proceeding between Oxford and Rehab, on March 10, 2009, Citibank commenced judicial foreclosure proceedings on the property and filed a notice of default; the notice of default specified that Citibank was foreclosing on the personal property collateral pursuant to California Uniform Commercial Code section 9604 (Foreclosure Action). Citibank sought appointment of a receiver to take possession of the property and any collateral.

On April 23, 2009, pursuant to the deed of trust on the property, the court appointed a receiver in the Foreclosure Action to take possession of the Downtown Lofts property and "Improvements and Rents and Profits" as defined in the deed of trust and security agreement as " 'all rents, issues, profits, security deposits, royalties, tolls, earnings, income and other benefits payable.' " The receiver was specifically ordered to "take no further action as to the funds previously or presently held or maintained by City National Bank or Provident Title until it has been established that either or both such funds are receivership assets."

On April 9, 2009, Oxford sought and was granted leave to intervene in the Foreclosure Action. Oxford's complaint in intervention sought to establish its rights in the two accounts at CNB and Provident. In its briefing on the issue, Oxford asserted it had superior rights to the funds in the two accounts because the funds did not constitute "rents and profits" from the Downtown Lofts as (1) the account at CNB was used exclusively for and during the construction of the Downtown Lofts property and had not been used since and (2) the Provident account was an escrow account created out of the $700,000 holdback of loan disbursements and was intended solely to ensure payment of outstanding contractor invoices. Thus, although some of the funds could be traced to the proceeds of Citibank's loan to the partnership, they were not " '[r]ents and [p]rofits.' "

On June 15, 2009, the court held in the Foreclosure Action that the two accounts were not property of the receivership estate because the receivership was "only a rents-and-profits 'asset' receivership over a piece of real property and its rental proceeds. It is not an 'equity' receivership over the entity Downtown Lofts. The scope of the receivership does not include all other collateral specified under the loan documents." Furthermore, the court found the two accounts held 2007 loan proceeds from Oxford and that "rents and profits" as defined in the deed of trust were income from the property after the date of default, which was December 2008. The court ordered the receiver to return any funds he held from these accounts to Downtown Lofts.

(b) *Citibank Attempts to Intervene in the Main Case*

Meanwhile, on April 9, 2009, Citibank sought leave to intervene in the main case. Citibank asserted the two accounts held funds that were the proceeds of Citibank's loan and thus covered by its security interest. Citibank further argued that it was not a party to the arbitration and therefore any ruling therein did not affect its right to the funds. Oxford opposed, contending that Citibank had no standing to demand that the arbitrator's award be modified or stayed; if Citibank had any perfected interest in the accounts, the proper procedure would be for Citibank to make a claim under Code of Civil Procedure section 720.210 when Oxford obtained a writ of possession; and Oxford's petition to confirm its award was a priority and it would be prejudiced by a continuance.

On August 5, 2009, the court denied Citibank's motion to intervene in the main case.

### (c) *Citibank's Trustee's Sale; Oxford's Writs of Possession*

On November 13, 2009, Citibank acquired the property at a trustee's sale.[3]

On November 17, 2009, in the main case, Oxford sought a writ of possession in the two accounts based on the arbitrator's decision that the funds in the two accounts constituted the property of Oxford. On December 18, 2009, Oxford obtained a writ of possession for the two bank accounts, and on March 1, 2010, the Los Angeles County Sheriff levied the funds. On March 8, 2010, Citibank delivered to the Sheriff a third party claim asserting ownership in the funds.

### 5. *Third Party Claim Proceedings*

On March 19, 2010, Citibank filed a petition in the main case for a hearing on its proposed levy of funds at Provident. Citibank asserted an interest in the funds pursuant to its security interest in Downtown Lofts's personal property as set forth in its UCC-1 filing.[4]

On March 23, 2010, Oxford filed amended petitions for hearing pursuant to Code of Civil Procedure section 720.310 to determine the validity of Citibank's third party claim in the funds held at CNB and Provident. Oxford asserted that on March 1, 2010, it had levied on the funds held by CNB pursuant to a writ of possession Oxford obtained on December 18, 2009. Oxford asserted the funds were not subject to Citibank's security interest because the funds were held by Downtown Lofts separate and apart from the Downtown Lofts property and the funds did not belong to Downtown Lofts; furthermore, Citibank's security interest in the account was unperfected and junior to Oxford's judgment lien. Oxford relied on the December 18, 2009 order issuing to Oxford a writ of possession on the funds held by Provident and CNB, and the court's June 17, 2009 order determining that the funds in the Provident and CNB accounts were not connected with the operation of Downtown Lofts, and therefore did not constitute "rents and profits."

---

[3] Although Citibank commenced the Foreclosure Action and sought judicial foreclosure of the real property, it later exercised its power of sale under the deed of trust. A beneficiary may pursue either remedy of judicial or nonjudicial foreclosure or both at the same time. However, once the property is sold at a trustee's sale, the beneficiary cannot claim a deficiency judgment in the judicial foreclosure proceeding. (Code Civ. Proc., § 580d; *Flack v. Boland* (1938) 11 Cal.2d 103, 107–108 [77 P.2d 1090].)

[4] Pursuant to California Uniform Commercial Code section 9604, subdivision (a)(2)(A), the provisions of Code of Civil Procedure section 726 (the one action rule) do not apply to the personal property component of mixed realty and personal collateral where the personal property is foreclosed in a nonunified sale. (Cf. *Florio v. Lau* (1998) 68 Cal.App.4th 637, 650 [80 Cal.Rptr.2d 409] [three-month limitation on deficiency judgment imposed by Code Civ. Proc., § 726 does not apply in the mixed collateral context to personal property collateral].)

Oxford's hearing brief argued that Citibank's security interest did not encompass the funds on deposit in these two accounts because the funds were earmarked for Oxford and were only held to satisfy certain requirements prior to ultimate disbursement to Oxford. Oxford argued that the funds were held in trust for Oxford; Citibank misleadingly described its collateral by omitting qualifying words "arising out of or relating to the acquisition, development, ownership, management, or use of the Land."

According to Gamwell's declaration, the terms of the purchase and sale of Oxford's interest in Downtown Lofts provided that it would be paid $2.5 million out of the pending Citibank loan proceeds, with Oxford to be paid the remaining $500,000 of the purchase price a year later. Oxford was to be paid out of the net Citibank loan proceeds, and any shortfall in those proceeds would be made up by Robbins and his companies. In order to assure Gamwell that Robbins would not abscond with the net loan proceeds, the parties arranged for Provident to pay Oxford and its affiliates' outstanding liabilities to third parties directly from the escrow account, and hold release of the net funds pending approval from Robbins and Gamwell.

With respect to the CNB account, Oxford asserted that contemporaneously with the closing of the Citibank loan, Robbins suggested certain of the funds be moved to a partnership bank account pending his approval of certain insurance certificates. To ensure that Robbins did not abscond with the funds, Gamwell insisted the monies be moved to a dormant account at CNB. Gamwell asserted the CNB account was, from its opening in 2003 through early summer of 2007, used to pay various costs of the project. At that point, the account was phased out, and was not used after the closing of the Citibank loan except for the handling of the net loan proceeds to Oxford. On August 23, 2007, $2,325,786 of Oxford's funds were placed into the account; $2 million was paid to Oxford on account of the PSA; however, Robbins refused to release the remaining funds even after approving the insurance certificates.

With respect to the Provident account, Oxford asserted that account related to mechanic's liens and other claims against the building. Provident insured title to the building free of any exceptions for possible mechanic's lien rights; Provident required that Gamwell promise that his construction company and his subcontractors would not make any lien claims against the building. Contemporaneously with the closing, $400,000 of the $700,000 was used to pay for unreimbursed liabilities, leaving a balance of $277,737.69. When Oxford attempted to obtain a release of the funds after payment of these liabilities, Robbins refused to release the funds.

Citibank contended that because the Final Award provided that if Rehab did not release the funds in the two accounts to Oxford, Rehab itself was to

pay Oxford the sums held in those accounts, the final award implicitly recognized Citibank's security interest. Further, it argued that because it was not a party to the arbitration, any rulings made therein were not binding on it, and that the accounts were squarely within the definition of collateral in the security agreement because "as a single asset real estate entity, everything about Downtown Lofts' business was related to the 'acquisition, development, ownership, management, or use' of the real property."

The trial court denied Citibank's claim. Although the court did not make findings, at the hearing the court stated that it found the funds in both accounts were the property of Oxford because "Downtown Lofts was subject to the ruling, to the holding of the arbiter, that the property that was under the title of Downtown Lofts was never the property of [Downtown Lofts]. And it appears that there have been other intervening factors that have prevented the release of those funds to Oxford even after the arbiter ha[d] made his finding. . . . But I think in the end what this court is left with is the finding by the arbiter and the final judgment of [the judge issuing Oxford's writs of possession] that those two accounts, CNB's account and Provident's account, are the property of Oxford. . . . By March of 2009 those funds should have [been] long gone, . . . and they never would have been part of the—any collateral that might have been claimed by Citibank as something they could then take when they foreclosed on the building, Downtown Lofts—that Downtown Lofts still held title to."

## DISCUSSION

Citibank argues that it had a perfected security interest in both accounts, properly completed foreclosure proceedings, and its interest in the accounts is superior to that of judgment creditor Oxford. Furthermore, neither the arbitration award nor Rehab's fraud overrides Citibank's entitlement to the accounts because Citibank was not a party to the arbitration, and where a partnership agreement is rescinded, the result is a claim against the other partners, not a right to unwind preexisting commitments to third parties such as Citibank.

Oxford contends that the transfer of ownership of the account funds was free and clear of any purported interest of Citibank (Cal. U. Com. Code, § 9332); the deposit accounts were not covered by Citibank's security interest because the accounts did not relate to the operations, ownership, or management of the building; Downtown Lofts never had the right to grant Citibank a security interest in the funds; and Citibank's security interest was never perfected under California Uniform Commercial Code section 9312, subdivision (b)(1), which requires "control" of the accounts pursuant to California Uniform Commercial Code section 9314.

■ We conclude that Citibank's security interest never attached to the two deposit accounts in the first instance because the debtor—Downtown Lofts—never had "rights in the collateral" pursuant to California Uniform Commercial Code section 9203, subdivision (b)(2). Thus, we need not consider issues of perfection and priority to resolve this issue.

## I.  THIRD PARTY CLAIM PROCEEDINGS

■ Where personal property has been levied upon (whether by writ of attachment, writ of execution, writ of sale or writ of possession), a party claiming a security interest or lien may file a third party claim pursuant to Code of Civil Procedure section 720.210 et seq. (*Peck v. Hagen* (1989) 215 Cal.App.3d 602, 607 [263 Cal.Rptr. 198].) After filing a claim with the levying officer setting forth its security interest, the secured party may petition the court for a hearing to determine the validity of the third party claim and the correct disposition of the property.[5] (Code Civ. Proc., § 720.310, subd. (a); *Peck v. Hagen, supra,* 215 Cal.App.3d at p. 607.)

At the hearing on the claim, the third party has the burden of proof. (Code Civ. Proc., § 720.360; *Whitehouse v. Six Corp.* (1995) 40 Cal.App.4th 527, 530 [48 Cal.Rptr.2d 600]; *Beverly Hills Thrift & Loan v. Western Dredging & Constr. Co.* (1961) 190 Cal.App.2d 298, 302 [12 Cal.Rptr. 107].) Once the third party establishes its entitlement to the property, the burden shifts to the creditor (in this case, Oxford) to establish that its claim is superior. (*Whitehouse v. Six Corp., supra,* 40 Cal.App.4th at p. 535.) There is no requirement of a jury trial in third party claim proceedings, and no findings are required. (Code Civ. Proc., §§ 720.400, 720.410; *Whitehouse v. Six Corp., supra,* 40 Cal.App.4th at p. 535.)

We review the trial court's factual findings regarding the ownership of the funds on deposit in the two accounts for substantial evidence. (*Mother Lode Bank v. General Motors Acceptance Corp.* (1975) 46 Cal.App.3d 807, 810–811 [120 Cal.Rptr. 429] [trial court's finding of security interest in vehicles reviewed under substantial evidence standard].) Under that standard, we consider whether there is any evidence, contradicted or uncontradicted, which will support the trial court's finding. (*Ibid.*)

## II.  CITIBANK'S SECURITY INTEREST IN DOWNTOWN LOFTS'S DEPOSIT ACCOUNTS DID NOT ATTACH TO OXFORD'S FUNDS IN THE TWO DEPOSIT ACCOUNTS

■ A security interest is defined as "an interest in personal property or fixtures which secures payment or performance of an obligation." (Cal. U.

---

[5] The levy is not quashed as a condition to resolving the competing claims. (Code Civ. Proc., §§ 701.830, subd. (a), 720.210, subd. (a); *Peck v. Hagen, supra,* 215 Cal.App.3d at p. 607.)

Com. Code, § 1201, subd. (a)(35).) Resolving conflicting claims in the same collateral requires a three-step inquiry: First, has the security interest attached; second, has the security interest been perfected; and third, does the perfected security interest have priority. (See generally *Bank of the West v. Commercial Credit Financial Services* (9th Cir. 1988) 852 F.2d 1162, 1166–1174.) Once a security interest has attached to the debtor's collateral (Cal. U. Com. Code, § 9301 et seq.), perfection of a security interest makes it enforceable against third parties and priority determines which of competing claims to collateral will take precedence (see Cal. U. Com. Code, § 9301 et seq.) The filing of a financing statement gives notice to and assures priority over interested third parties. (*New West Fruit Corp. v. Coastal Berry Corp.* (1991) 1 Cal.App.4th 92, 97 [1 Cal.Rptr.2d 664, 11 Cal.Rptr.2d 664].)

Relevant here is whether Citibank's security interest attached to the loan proceeds that were due Oxford on account of the PSA. A security interest attaches and is enforceable if "(1) [v]alue has been given[,] [¶] (2) [t]he debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party," and (3) there is some evidence that the debtor intended to create a security interest in the collateral. (Cal. U. Com. Code, § 9203, subd. (b).)

A security interest attaches only to whatever rights the debtor has in the collateral. (*In re Coupon Clearing Service, Inc.* (9th Cir. 1997) 113 F.3d 1091, 1102–1103.) The term "rights in the collateral" is not defined in the California Uniform Commercial Code; rather, the determination is made by reference to "[o]ther law." (U. Com. Code com. 3, 23B pt. 2 West's Ann. Cal. U. Com. Code (2002 ed.) foll. § 9408, p. 511.) While California Uniform Commercial Code section 9203 does not require the debtor to own or hold title to the collateral, "mere possession of a collateral by a debtor is not sufficient to constitute 'rights in the collateral' under section 9203." (*In re Coupon Clearing Service, Inc., supra,* 113 F.3d at p. 1103.) Further, comment 6 to section 9203 provides "in accordance with basic personal property conveyancing principles, the baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be." (U. Com. Code com. 6, 23B pt. 2 West's Ann. Cal. U. Com. Code, *supra,* foll. § 9203, p. 172.) Thus, in *Bank of the West v. Commercial Credit Financial Services, supra,* 852 F.2d 1162, the secured party bank did not acquire a security interest in a beverage company until the beverage company was transferred by the parent corporation of the debtor from one of its subsidiaries to the debtor because until that time, the debtor had no rights in the collateral. (*Id.* at pp. 1167–1168; see *Mother Lode Bank v. General Motors Acceptance Corp., supra,* 46 Cal.App.3d at pp. 813–814 [car dealer who did not have title to cars did not have rights in collateral and could not convey security interest in them].)

Further, in analyzing the scope of the security interest Downtown Lofts granted to Citibank, we apply general contractual interpretation principles. "[T]o determine the intended scope of secured obligations we must look to the reasonable expectations of the parties. [Citation.] To this end we utilize general principles governing commercial agreements as well as specific rules pertaining to secured transactions." (*New West Fruit Corp. v. Coastal Berry Corp., supra,* 1 Cal.App.4th at p. 99.) Under the California Uniform Commercial Code, an agreement "means the bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade as provided in Section 1303." (Cal. U. Com. Code, § 1201, subd. (b)(3).)

Here, Citibank has not met the requirements of California Uniform Commercial Code section 9203.

First, Oxford has traced the funds in both accounts back to the loan proceeds that were due it on account of the PSA, thus establishing that Downtown Lofts had "no rights in the collateral" to entitle it to use those funds as security for the Citibank refinance. Oxford was entitled to receive $2.5 million from the Citibank loan proceeds. Oxford received $2 million directly from the CNB account, leaving a balance due it at closing of the loan of $500,000. The CNB account contains $229,237.19 of these undisbursed loan proceeds due Oxford. With respect to the funds in the Provident account, Oxford has traced $400,000 of those monies that were intended to pay for Oxford's lien claim obligations; after those obligations were paid, the balance was due Oxford on account of the sale of its partnership interest to Rehab.

Second, the circumstances of the refinancing establish that the proceeds of the refinancing which were used to buy out Oxford were not intended by debtor Rehab to constitute security for Citibank, nor do the terms of the security agreement cover these loan proceeds. Gamwell's declaration established that the parties intended that Oxford would be paid $2.5 million from the Citibank loan proceeds, and that Robbins and his related companies would make up the shortfall. Thus there is no evidence that Rehab intended the security interest to attach to funds that were due Oxford on account of the sale of the partnership interest, whether it be the funds transferred to the dormant CNB account, or the funds left on deposit in the Provident escrow to satisfy Oxford's lien claimants. Indeed, the language of the security agreement and the UCC-1 financing statement did not cover the proceeds of the refinancing that were used to buy out Oxford. Such loan proceeds used to buy out Oxford's partnership share did not constitute "interests which [Downtown Lofts] now has or may hereafter acquire in [¶] . . . [¶] . . . deposit accounts . . . in which [Downtown Lofts] now has or may hereafter have an interest arising out of, or relating to, the acquisition, development, ownership, management or use of said real property" for which value was given.

Citibank's bare statement that the loan proceeds constituted its collateral simply because they are deposit accounts held in the name of Downtown Lofts, Citibank's debtor under the security agreement and financing statement, does nothing to rebut Oxford's tracing the agreed purpose and origin of the funds, the intent of the parties, or the fact no value was given for the purported security interest. As we are able to resolve Oxford's entitlement to the funds based on the threshold issue of attachment, we need not consider the parties' other arguments.

## DISPOSITION

The judgment is affirmed. Respondent is to recover its costs on appeal.

Mallano, P. J., and Chaney, J., concurred.