Filed 7/16/24  Dickson v. Higgs Fletcher & Mack, LLP CA4/1

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NICHOLAS DICKSON,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>HIGGS FLETCHER & MACK, LLP,<br><br>    Third Party Claimant and<br>Appellant. | D081851<br><br><br><br>(Super. Ct. No. 37-2021-00042299-PR-TR-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Julia C. Kelety, Judge.  Affirmed.

Higgs Fletcher & Mack, John Morris and Steven M. Brunolli, for Third Party Claimant and Appellant.

Grant & Kessler and Phillip A. Zunshine, for Plaintiff and Respondent.

The law firm Higgs, Fletcher & Mack LLP (HFM) appeals from the trial court's judgment denying HFM's third party claim (Code Civ. Proc.,[1] § 720.110), in which it claimed ownership of $585,000 in funds it received from its client Jack Mann pursuant to a flat fee agreement for future legal representation that HFM entered into with Mann.  The disputed funds were

---

[1]    Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

located in HFM's client trust account when Mann's judgment creditor served HFM with a notice of levy on the theory that the funds belonged to Mann. HFM contends that the trial court erred in concluding that the funds belonged to Mann rather than to HFM. HFM also challenges the trial court's denial of its motion for reconsideration of that ruling, which related to $53,457.95 of the disputed funds.

We conclude that HFM's appellate challenge is without merit, and we accordingly affirm the judgment.

## I.

## FACTUAL AND PROCEDURAL BACKGROUND

In the underlying litigation, which arose out of Mann's alleged misconduct as trustee of the M. Chris Dickson Revocable Living Trust dated February 23, 1996 (the Trust), Mann stipulated to the entry of a $12 million judgment in favor of Nickolas Dickson, individually and in his capacity as trustee of the Trust (Dickson). Judgment was entered on August 8, 2022.[2]

---

[2] Concurrently with the filing of his respondent's brief on December 14, 2023, Dickson filed a request that we take judicial notice of the stipulation for immediate entry of judgment and the judgment from the underlying litigation, both dated August 8, 2022. We note that because those documents are part of the record in the trial court action from which this appeal arises, Dickson could have submitted them as a respondent's appendix along with his respondent's brief. (Cal. Rules of Court, rule 8.845 (e)(3).) Nevertheless, we grant Dickson's unopposed request to take judicial notice.

HFM filed a request for judicial notice on September 6, 2023, regarding the complaint in *Nicholas Dickson, et al. v. Jack I. Mann, et al.*, San Diego Superior Court case No. 37-2022-00034223-CU-FR-CTL, dated August 24, 2022, in which Dickson sought to set aside allegedly voidable transactions entered into by Mann. A court record is a proper subject for judicial notice. (Evid. Code § 452, subd. (d)). We accordingly grant the unopposed request to take judicial notice.

On August 22, 2022, Dickson served HFM with a notice of levy for any money it was holding in trust for Mann.  On September 1, 2022, HFM filed with the San Diego County Sheriff's Department a verified third party claim disputing Dickson's right to the funds.  (Code Civ. Proc., §§ 720.110-720.130.)  In the third party claim, HFM explained that due to a written engagement agreement that HFM and Mann entered into on August 6, 2022 (the Engagement Agreement), it claimed an "ownership and/or possessory/security interest" in $585,000 of funds HFM received from Mann and placed in HFM's client trust account.[3]  A petition to decide the validity of the third party claim was subsequently filed with the trial court.[4]

The August 6, 2022 Engagement Agreement between HFM and Mann was attached as an exhibit to HFM's third party claim.  The Engagement Agreement stated that it covered HFM's provision of legal services to Mann "relating to [Mann's] role as trustee of [the Trust], including any actions

---

[3]    Although the third party claim was vague as to whether it was asserting an *ownership* interest by HFM in the disputed funds or a *security* interest, HFM's subsequent briefing in the trial court proceeded under the theory that the Engagement Agreement determined the "ownership" of the funds, which "became the property of HFM" due to that agreement.  Similarly, on appeal, HFM argues that upon the signing of the Engagement Agreement "the funds belonged to HFM."

[4]    Section 720.310, subdivision (a) states that "[n]ot later than 15 days after the third-party claim is filed with the levying officer . . . either the creditor or the third person may petition the court for a hearing to determine the validity of the third-party claim and the proper disposition of the property that is the subject of the claim."  Although the parties have not provided us with the petition filed in the trial court regarding HFM's third party claim, we infer from entries in the Register of Actions that Dickson petitioned the trial court to decide the validity of HFM's third party claim.

seeking to collect thereon," for which Mann agreed "to pay a flat fee in the amount of $585,000, inclusive of costs."

As centrally important here, paragraph 4(c) of the Engagement Agreement states, "Both [HFM] and [Mann] understand and acknowledge that (1) [Mann] has the right to have [HFM] deposit the Flat Fee in a trust account until the fee is earned; and that in such case, (2) [Mann] is entitled to a refund of any amount of the Flat Fee that is unearned because the services were not completed. Despite being fully informed of the rights described in the preceding sentence, [Mann] consents to [HFM] depositing the Flat Fee into [HFM]'s operating account upon payment and consents to such fee being deemed earned by [HFM] when received."

HFM explained in its third party claim that as of the date of the August 6, 2022 Engagement Agreement, it held $585,000 of Mann's funds in its client trust account.[5] If Dickson's levy had not been served on August 22, 2022, HFM would have transferred the $585,000 to its own operating account at the end of the month, in accordance with its normal business practices. A declaration from Mann's attorney at HFM explained that the flat fee of $585,000 was intended to cover HFM's provision of legal services in at least four separate matters. The projected budgets for three of those matters indicated that if HFM billed for its services at an hourly rate, the value of HFM's anticipated legal services on the three matters was expected to be at least $948,260. HFM presented no evidence during the litigation of its third party claim that it had begun providing any of the legal services covered by

---

[5] During litigation of the third party claim, it was established that HFM had received the $585,000 from Mann in two parts. First, HFM was already holding approximately $125,000 from Mann in its client trust fund due to its preexisting relationship with Mann, and on August 3, 2022, Mann transferred $460,000 to HFM.

4

the $585,000 flat fee at the time the notice of levy was served on August 22, 2022.[6]

In opposition to the third party claim, Dickson relied exclusively on the fact that the $585,000 was located in HFM's client trust account when the notice of levy was served, arguing that the location of the funds was dispositive. Dickson argued, "Because funds in a client trust account belong to the client, the Funds belonged to [Mann]," and therefore "[u]ntil the Funds were paid to [HFM]—by being transferred from the client trust account to [HFM's] account—the Funds still belonged to [Mann]." For this argument, Dickson relied on rule 1.15(a) of the State Bar Rules of Professional Conduct,[7] which it characterized as establishing that "[m]oney in trust belongs to the client."

In reply, HFM disputed Dickson's interpretation of rule 1.15(a). HFM argued that the rule "does not say that all funds in a trust account are necessarily client funds, especially where—as here—the express agreement between the client and law firm dictates otherwise." According to HFM, "the contract between the parties controls ownership of the funds," and under the Engagement Agreement, "[o]nce the funds are received, HFM's ownership is established, regardless of where it holds those funds." In HFM's view, "when Mr. Mann signed the Flat Fee Agreement and paid HFM $585,000, he intended to, and did in fact, transfer ownership to the $585,000 to HFM."

The trial court held a hearing on December 7, 2022. After extensive argument from the parties, the trial court denied HFM's third party claim.

[6]    Counsel for HFM confirmed at the December 7, 2022 hearing on the third party claim that no such evidence was before the court.

[7]    Unless otherwise indicated, all further references to rules are to the current version of the State Bar Rules of Professional Conduct.

5

The trial court rejected Dickson's contention that the location of the funds in HFM's client trust account was "absolutely dispositive."[8] However, the trial court identified two different grounds for its ruling, neither of which Dickson had advanced in opposing the third party claim.

First, the trial court looked to the Rules of Professional Conduct, from which it derived the principle that, even when a client pays a flat fee to an attorney, "in the event the services for which the fee has been paid are not completed . . . it belongs to the client."[9] The trial court observed that "there is no evidence in the record that any of the services for which the [$585,000] was paid have been completed." The trial court accordingly concluded, "So as we sit here today, in the absence of any proof that any amount has been claimed, I do believe that the full amount is subject to the levy and does not belong to [HFM] because it has not been earned."

Next, as an independent basis for its ruling, the trial court relied on the Uniform Voidable Transactions Act. (Civ. Code, § 3439 et seq.) The trial court acknowledged that the parties had not discussed the Uniform Voidable Transactions Act in their briefing, but explained that "it's very clear that act

---

[8] Specifically, the trial court explained that "since Mr. Mann consented" to the funds being moved from the client trust account to the operating account "then perhaps" the fact that the funds were still in the client trust account was "not an impediment that the Court should consider."

[9] The trial court specifically stated it was relying on "[Mann's] rights under Rule 1.15(b)(1)." As we will discuss, that rule states that when a client enters into an agreement to pay a flat fee in exchange for the provision of legal services, and that fee is deposited in the lawyer's operating account, the client must be informed that "the client is entitled to a refund of any amount of the fee that has not been earned in the event the representation is terminated or the services for which the fee has been paid are not completed." (Rule 1.15(b)(1).)

6

applies."[10]  After discussing certain of the statutory factors that can be used to determine unlawful intent under the Uniform Voidable Transactions Act (Civ. Code, § 3439.04, subd. (b)), the trial court concluded that Dickson's attempt to transfer ownership of the $585,000 to HFM through the Engagement Agreement was void because Mann "intended to delay or hinder or defraud" Dickson.

The trial court ordered HFM to turn over the $585,000 no later than December 13, 2022.

HFM filed a motion for reconsideration on December 13, 2022, in which it requested that the trial court amend its ruling to allow HFM to keep $53,457.95 of the $585,000.  Specifically, HFM explained that prior to the August 6, 2022 Engagement Agreement, HFM and Mann entered into an agreement on April 21, 2021 (the 2021 Agreement), under which HFM agreed to provide legal services to Mann, with HFM entitled to a lien on any amount that Mann deposited with HFM under the 2021 Agreement.  HFM sought to

_____

[10]    The parties did not discuss the Uniform Voidable Transactions Act in their briefing.  However, the trial court mentioned that statute during the December 7, 2022 hearing and gave counsel an opportunity to discuss its applicability before ruling on HFM's third party claim.  At the hearing, counsel for Dickson stated that he did not think it was necessary for the court to rely on the Uniform Voidable Transactions Act to deny HFM's third party claim, but he also argued that "[i]t seems pretty obvious to me what happened here is [Mann] decided to take his liquid assets and move them to his attorneys," which was "absolutely a fraudulent transfer and should go into the consideration for denying this third-party claim."  Counsel for HFM argued that the payment was not a voidable transaction.  He also pointed out that Dickson had a pending lawsuit against Mann alleging various fraudulent transfers, but the lawsuit did not encompass the $585,000 payment to HFM.  HFM argued that if Dickson wanted to pursue the theory that the payment to HFM was subject to the Uniform Voidable Transactions Act, that transaction should be added to the pending lawsuit rather than being decided as part of the third party claim.

7

rely on evidence showing that (1) $125,000 of Mann's funds in HFM's client trust account at the time of the August 22, 2022 notice of levy were deposited by Mann in connection with 2021 Agreement; and (2) Mann owed HFM $53,457.95 for services provided under the 2021 Agreement.  Based on those facts, HFM sought to establish that it had a superior claim to $53,457.95 of the $585,000.

HFM explained that it did not submit evidence regarding the 2021 Agreement during the litigation of the third party claim because it did not foresee the basis for the trial court's ruling.  HFM characterized the trial court's ruling as having "invalidated HFM's [Engagement Agreement] with Mann."  According to HFM, "[b]ecause Mr. Dickson did not previously argue the [Engagement Agreement] was invalid, HFM did not submit any evidence of its prior agreements with Mr. Mann under which it previously held funds paid by Mr. Mann."

The trial court denied the motion for reconsideration.  The trial court explained, "[HFM] has two legal theories to support its claim to the funds: (1) the [Engagement Agreement]; and (2) the prior agreement and fees incurred.  When [HFM] served its third-party claim, it only pursued the first theory.  [HFM] either chose not to pursue the second theory, or did not realize that the second theory was available.  In either event, a party acting with reasonable diligence would have pursued both theories.  This is especially true in light of [section] 720.130, [subdivision] (b), which provides that '[a] copy of any writing upon which the claim is based shall be attached to the third-party claim.  At a hearing on the third-party claim, the court in its discretion may exclude from evidence any writing a copy of which was not attached to the third-party claim.' "  The trial court also explained that, contrary to HFM's characterization, it "never entered an order invalidating

the flat fee agreement," but only ordered that Mann's attempt to transfer the funds to HFM's ownership was a voidable transfer.

The trial court concluded, "In summary, [HFM] was aware of the alleged 'new' facts at the time it filed and litigated its third-party claim, and [HFM] did not act with reasonable diligence in failing to present these alleged 'new' facts. [HFM] has therefore failed to meet the threshold requirements for reconsideration, and the motion is denied."

HFM appeals from the trial court's judgment denying its third party claim. (§ 720.390 ["An appeal may be taken from a judgment given pursuant to Section 720.390"]), and, as part of its appeal, it contends that the trial court erred in denying the motion for reconsideration.

## II.

## DISCUSSION

A.    *Legal Standards for the Litigation of Third Party Claims*

The Enforcement of Judgments Law (§ 680.010 et seq.) "is a comprehensive scheme governing the enforcement of all civil judgments in California." (*Imperial Bank v. Pim Electric, Inc.* (1995) 33 Cal.App.4th 540, 546.) Under the Enforcement of Judgments Law, where personal property has been levied upon under a writ of execution, a third party who claims ownership of or the right to possess the property may file a third party claim with the levying officer. (§ 720.110, subd. (b).)[11] Next, "either the creditor or the third person may petition the court for a hearing to determine the validity of the third-party claim and the proper disposition of the property that is the subject of the claim." (§ 720.310, subd. (a).) A hearing on the

---

[11]    Similarly, a third party who claims a superior security interest or lien on property, rather than an ownership or possessory interest in property, may file a third party claim. (§ 720.210.)

9

third party claim "shall be held within 20 days after the filing of the petition unless continued by the court for good cause shown." (*Id.,* subd. (c).) The purpose of the third party claim procedure is "to give a quick and effectual remedy to third parties whose property has been levied upon by mistake." (*Regency Outdoor Advertising, Inc. v. Carolina Lanes, Inc.* (1995) 31 Cal.App.4th 1323, 1329.) "Third-party claims are, by nature, summary proceedings." (*Cassel v. Kolb* (1999) 72 Cal.App.4th 568, 579 (*Cassel*).) "There is no requirement of a jury trial in third-party claim proceedings, and no findings are required." (*Oxford Street Properties, LLC v. Rehabilitation Associates, LLC* (2012) 206 Cal.App.4th 296, 307 (*Oxford Street*) [citing §§ 720.400, 720.410].)

At a hearing on a third party claim, the third party bears the burden of proving its interest by a preponderance of the evidence. (§ 720.360; *Whitehouse v. Six Corp.* (1995) 40 Cal.App.4th 527, 530.) "Once the third party establishes its entitlement to the property, the burden shifts to the creditor . . . to establish that its claim is superior." (*Oxford Street, supra,* 206 Cal.App.4th at p. 307; see also *Whitehouse,* at pp. 535, 537 [after a third party claimant meets its burden, the judgment creditor may seek to prove that its interest is superior because the judgment debtor's transfer of property to the third party was fraudulent].)

On appeal, we review the trial court's factual findings for substantial evidence, and we independently review the trial court's determination of questions of law. (See *Oxford Street, supra,* 206 Cal.App.4th at p. 307; *Cassel, supra,* 72 Cal.App.4th at p. 573.)

As the parties agree about the relevant facts relating to the Engagement Agreement, our analysis turns largely on the legal question of whether, under the undisputed facts, HFM had ownership of the $585,000 in

10

its client trust account.  As we will explain, the answer to that question derives principally from the applicable Rules of Professional Conduct.

B.      *The Location of the Funds in the Client Trust Account Is Not Dispositive*

The first issue is whether, as Dickson contends, the $585,000 necessarily belonged to Mann because it was in HFM's client trust account. Dickson claims that "[m]oney in trust belongs to the client," so that, "by definition, this means the funds belonged to Mann, not [HFM]."  According to Dickson, "the fact that the $585,000 was in [HFM's] trust account was dispositive," and that "to obtain ownership of the funds, [HFM] was required to move the funds to its operating account."

To support its assertion that funds in a law firm's client trust account necessarily belong to a client rather than to the law firm, Dickson relies primarily on rule 1.15(a).  That rule states, in relevant part, "All funds received or held by a lawyer or law firm for the benefit of a client . . . including advances for fees, costs and expenses, shall be deposited in one or more identifiable bank accounts labeled 'Trust Account' or words of similar import . . ."  (Rule 1.15(a), asterisks omitted.)

On its face, rule 1.15(a) addresses only *where* a lawyer or law firm should place funds held for the benefit of a client.  The rule does not categorically state that a law firm may *never* hold its *own* funds in a client trust account.  Rule 1.15(c) describes the limited circumstances in which a law firm's own funds *may* be held in a client trust account:

> "(c) Funds belonging to the lawyer or the law firm shall not be deposited or otherwise commingled with funds held in a trust account *except*:
>
> "(1) funds reasonably sufficient to pay bank charges; and
>
> "(2) funds belonging in part to a client or other person and in part presently or potentially to the lawyer or the law firm, *in which*

11

*case the portion belonging to the lawyer or law firm must be withdrawn at the earliest reasonable time after the lawyer or law firm's interest in that portion becomes fixed.* However, if a client or other person disputes the lawyer or law firm's right to receive a portion of trust funds, the disputed portion shall not be withdrawn until the dispute is finally resolved." (Rule 1.15(c), italics added; asterisks omitted.)

HFM contends that its interest in the $585,000 became fixed by virtue of the Engagement Agreement on August 6, 2022, and that it was planning to withdraw the $585,000 to its operating account at the end of the month according to its normal business practices. On that premise, HFM could reasonably argue that rule 1.15(c) permitted it to hold the $585,000 in its client trust account for a short period of time in August 2022 even though it claimed ownership of those funds beginning on August 6, 2022.[12] Thus, we cannot conclude that the funds belonged to Mann *merely* because they were located in the client trust account. That fact alone is not dispositive.

---

[12]  Dickson cites case law to argue that "[i]f an attorney keeps his own funds in his client trust account, the attorney is committing an ethical violation." (*Hamilton v. State Bar* (1979) 23 Cal.3d 868, 876; *Murray v. State Bar* (1985) 40 Cal.3d 575, 583.) Those cases describe extreme situations in which an attorney blatantly ignored the applicable rules concerning client trust accounts, which is not the circumstance here, as the funds were located in HFM's client trust account only for a short time pending a planned transfer to HFM's operating account. Dickson also cites *Prakashpalan v. Engstrom, Lipscomb & Lack* (2014) 223 Cal.App.4th 1105, 1123, which explains that "an attorney's client trust account is an express trust." That case does not specifically discuss the limited circumstances, set forth in rule 1.15(c), in which a law firm is permitted to briefly hold its own funds in a client trust account.

C.    *The Trial Court Properly Denied the Third Party Claim Because HFM Presented No Evidence That It Had Earned the Flat Fee*

Having determined that the location of the $585,000 in HFM's client trust account on August 22, 2022, is *not* dispositive, in itself, to prove that Mann owned the funds rather than HFM, we must consider whether the trial court properly concluded that Mann nevertheless continued to own the funds. As the trial court explained, it concluded that the funds belonged to Mann because (1) there was no evidence that HFM had performed any legal services under the Engagement Agreement to earn the $585,000; and (2) the Rules of Professional Conduct provide that unearned funds under a flat fee agreement are to be returned to the client. As we will explain, the trial court reached the correct conclusion under the applicable rules.

We begin with the rules that govern the type of flat fee agreements set forth in the Engagement Agreement. Rule 1.5(e) states that "[a] lawyer may make an agreement for, charge, or collect a flat fee for specified legal services. A flat fee is a fixed amount that constitutes complete payment for the performance of described services regardless of the amount of work ultimately involved, and which may be paid in whole or in part in advance of the lawyer providing those services." Although flat fee agreements are permitted, the Rules of Professional Conduct are clear that a flat fee agreement may *not* be denominated as " 'earned on receipt' or 'non-refundable,' " or using "similar terms." (Rule 1.5(d).) This is because, as stated in rule 1.5(d), "A lawyer may make an agreement for, charge, or collect a fee that is denominated as 'earned on receipt' or 'non-refundable,' or in similar terms, *only if* the fee is *a true retainer* and the client agrees in writing after disclosure that the client will not be entitled to a refund of all or part of the fee charged. A true retainer is a fee that a client pays to a lawyer to ensure the lawyer's availability to the client during a specified period or on a

13

specified matter, but not to any extent as compensation for legal services performed or to be performed." (Rule 1.5(d), italics added; asterisks omitted.)[13]

The Rules of Professional Conduct specify that, although a flat fee cannot be deemed to have been earned upon receipt, it may nevertheless be placed in a law firm's operating account rather than in its client trust account. However, such an approach is allowed only if certain disclosures are made to the client, which, taken together, clarify for the client that the funds are not earned until the legal services are actually provided. Specifically, consistent with the principle that only a *true retainer* may be described as earned on receipt and nonrefundable, rule 1.15(b) states, that "a flat fee paid in advance for legal services may be deposited in a lawyer's or law firm's operating account, provided: [¶] (1) the lawyer or law firm discloses to the client in writing (i) that the client has a right under paragraph (a) to require that the flat fee be deposited in an identified trust account until the fee is earned, and (ii) that the client is entitled to a refund of any amount of the fee that has not been earned in the event the representation is terminated or the services for which the fee has been paid are not completed[.]" (Rule 1.15(b)(1), asterisks omitted.) Further "if the flat fee exceeds $1,000.00," the

---

13    Comment 2 to rule 1.15 states that "a lawyer or law firm may enter into an agreement that defines when or how an advance fee is earned," but specifies that the ability to enter into such an agreement is "*subject to Rule 1.5.*" (Rule 1.15, comment 2, italics added.) Because, as we have explained, rule 1.5 states that only a true retainer may be denominated as "earned in advance," it follows that a lawyer or law firm may not enter into an agreement stating that *other* types of advance fees, such as flat fees, are "earned in advance."

client's signed consent is required. (Rule 1.15(b)(2).)[14] Rule 1.16(e) confirms that because a flat fee is a type of advance fee (and is not a true retainer), a flat fee must be refunded to the client if the fee is not earned: "Upon the termination of a representation for any reason: [¶] . . . [¶] (2) the lawyer promptly shall refund any part of a fee or expense paid in advance that the lawyer has not earned or incurred. This provision is not applicable to a true retainer fee paid solely for the purpose of ensuring the availability of the lawyer for the matter." (Rule 1.16(e).) Together, these rules make clear that a flat fee paid by a client to a lawyer for future legal services does not belong to the lawyer until the fee is earned through the actual provision of legal services.

The current rules are the result of "a comprehensive revision," effective November 1, 2018. (*In re Jenkins* (2023) 14 Cal.5th 493, 513. fn. 13.) Prior to the 2018 revision, the Rules of Professional Conduct did not expressly discuss flat fee agreements or explain how lawyers were required to treat funds

---

[14] We note that the Engagement Agreement's language deviates from the disclosure required by rule 1.15(b)(1) in one substantive manner. The Engagement Agreement states that "(1) [Mann] has the right to have [HFM] deposit the Flat Fee in a trust account until the fee is earned; *and that in such case*, (2) [Mann] is entitled to a refund of any amount of the Flat Fee that is unearned because the services were not completed." (Italics added.) The italicized words do not appear in the client disclosure described in rule 1.15(b)(1), and they arguably change the meaning of the client disclosure in a manner that diverges from the allowable treatment of a flat fee agreement under the Rules of Professional Conduct. By virtue of the additional words, the Engagement Agreement appears to state that a client has a right to a refund *only if* the client chooses to have the flat fee held in the client trust account rather than in the law firm's operating account. However, we have explained, regardless of *where* the flat fee is held, a client has a right to refund until the fee is earned through the provision of legal services. (Rules 1.5(d), 1.16(e).)

obtained from clients pursuant to such agreements.  (See former Rules of Professional Conduct, rules 4-100 ["Preserving Identity of Funds and Property of a Client"], 4-200 ["Fees for Legal Services"]; see also *Baranowski v. State Bar* (1979) 24 Cal.3d 153, 164 [noting that under the then-applicable rules it was not clear "whether or not an advance fee payment" other than a true retainer "is correctly characterized as money 'received or held for the benefit of clients' " that was required to be placed in a client trust account].)[15]  As the Commission for the Revision of the Rules of Professional Conduct explained with respect to rule 1.5(d) and (e), "these new provisions implement a basic concept of contract law; namely that, except for true retainers, an advance fee is never earned unless and until a lawyer provides the agreed upon services for which the lawyer was retained."  (Rules Prof. Conduct, rule 1.5 [eff. Nov. 1, 2018], Commission for Revision of Rules of Professional Conduct, Executive Summary, p. 2.)[16]

---

[15]    Due to the lack of clarity in the former rules, federal courts observed that it was unclear how California treated the ownership of fees paid in advance by a client.  (See, e.g., *In re McDonald Bros. Const., Inc.* (Bankr. N.D. Ill. 1990) 114 B.R. 989, 1001; *In re Montgomery Drilling Co.* (Bankr. E.D. Cal. 1990) 121 B.R. 32, 38; *In re GOCO Realty Fund I* (Bankr. N.D. Cal. 1993) 151 B.R. 241, 251–252; *Kun v. Mansdorf* (*In re Woodcraft Studios, Inc.*) (N.D. Cal. 2011) 464 B.R. 1, 12 fn. 9; see also Sarah C. Hays, D. Edward Hays, *Good Help Is Hard to Fund:  The Problem of Earned Upon Receipt Retainers and Pre-Funded Litigation* (2016) 33 Cal. Bankr. J. 421, 426, 437–440 [analyzing whether, under the former rules, a client in California retains an interest in a flat fee paid in advance of the provision of services].)

[16]    Available at chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.calbar.ca.gov/Portals/0/documents/rules/Rule_1.5-Exec_Summary-Redline.pdf [last accessed July 11, 2024].

As the trial court accurately observed, HFM presented no evidence that it had performed any legal services under the Engagement Agreement to earn any of the $585,000 flat fee. Because there was no evidence that HFM had performed any services under the Engagement Agreement prior to the service of the notice of levy on August 22, 2022, HFM had not yet earned any of the $585,000 flat fee that was located in HFM's client trust account at that time.

Even though the Engagement Agreement states that "[Mann] consents to . . . the Flat Fee . . . *being deemed earned by [HFM] when received*" (italics added), the Rules of Professional Conduct are clear that a flat fee is, in fact, *not* earned until services are provided. (Rule 1.5(d) ["[a] lawyer may make an agreement for, charge, or collect a fee that is denominated as 'earned on receipt' or 'non-refundable,' or in similar terms, *only if* the fee is *a true retainer,*" italics added].) Because there was no evidence that HFM provided any legal services under the Engagement Agreement prior to August 22, 2022, the flat fee paid according to the Engagement Agreement belonged to Mann on that date. The trial court properly denied HFM's third party claim because HFM did not establish ownership of the $585,000 that it received from Mann and placed in its client trust account.[17]

_____

[17] Because we conclude that the trial court properly denied the third party claim on the ground that HFM had not yet earned the fees paid under the Engagement Agreement, we need not, and do not, consider the second independent ground that the trial court gave for denying the third party claim, namely that the Uniform Voidable Transactions Act (Civ. Code, § 3439 et seq.) was applicable. Among other things, we express no view on whether, as HFM contends, the trial court "violated HFM's due process rights . . . by making a sua sponte finding at the hearing . . . that Mann's transfer of funds to HFM violated the [Uniform] Voidable Transactions Act."

D.     *The Trial Court Did Not Abuse Its Discretion by Denying HFM's Motion for Reconsideration*

We next consider HFM's challenge to the trial court's denial of its motion for reconsideration.

Section 1008, subdivision (a) states that a party may "within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order." (§ 1008, subd. (a).) A party seeking reconsideration . . . must provide a satisfactory explanation for the failure to produce the evidence at an earlier time." (*New York Times Co. v. Superior Court* (2005) 135 Cal.App.4th 206, 212 (*New York Times*); see also *California Correctional Peace Officers Assn. v. Virga* (2010) 181 Cal.App.4th 30, 46 fn. 15 ["It has long been the view that a party seeking reconsideration of a prior order based on 'new or different facts' must provide a satisfactory explanation for failing to present the evidence sooner."].) "The burden under section 1008 is comparable to that of a party seeking a new trial on the ground of newly discovered evidence: the information must be such that the moving party could not, with reasonable diligence, have discovered or produced it" at the original hearing. (*New York Times,* at pp. 212–213.) "A trial court's ruling on a motion for reconsideration is reviewed under the abuse of discretion standard." (*Id*. at p. 212.)

As we have explained, HFM sought reconsideration to have the trial court take into account HFM's 2021 Agreement with Mann. HFM argued that it had a lien on $53,457.95 of the $585,000 in the client trust account based on legal services it had provided under the 2021 Agreement. In the motion for reconsideration, HFM explained that it did not originally submit evidence relating to the 2021 Agreement because it did not realize that the

18

trial court would reject its contention that it owned the entirety of the $585,000 by virtue of the Engagement Agreement it entered into with Mann on August 6, 2022.

We conclude that the trial court was well within its discretion to deny the motion for reconsideration. It is undisputed that the evidence regarding the 2021 Agreement existed at the time HFM filed its third party claim. HFM easily could have identified the 2021 Agreement as a *second* ground for its third party claim, but it chose instead to rely *solely* on its claim of ownership based on the Engagement Agreement.

HFM has presented no "satisfactory explanation" for its failure to identify the 2021 Agreement as an alternative ground for its third party claim. (*New York Times*, *supra*, 135 Cal.App.4th at p. 212.) HFM argues on appeal that "it was only *after* the trial court ruled—based on the fact that HFM had not presented evidence that any of its services had already been completed—that HFM could possibly have understood the need for 'new' evidence or additional argument addressed to that point." This argument lacks merit because HFM's motion for reconsideration related only to legal fees owing for services provided under the 2021 Agreement, not the Engagement Agreement. The motion for reconsideration did not seek to remedy HFM's failure to present evidence of legal services provided under the Engagement Agreement.

Further, section 720.130, subdivision (b) states, "A copy of any writing upon which the claim is based shall be attached to the third-party claim. At a hearing on the third-party claim, the court in its discretion may exclude from evidence any writing a copy of which was not attached to the third-party claim." (§ 720.130, subd. (b).) Because the 2021 Agreement was not attached

19

to the third party claim, the trial court had the express discretion to decline to consider it and to deny the motion for reconsideration on that basis.

In sum, because HFM failed to attach the 2021 Agreement to its third party claim and failed to make any argument regarding the 2021 Agreement while litigating the third party claim, even though it easily could have done so, the trial court did not abuse its discretion by denying the motion for reconsideration.

DISPOSITION

The judgment denying HFM's third party claim is affirmed. Dickson shall recover his costs on appeal.

IRION, Acting P. J.

WE CONCUR:

DATO, J.

BUCHANAN, J.